UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS, 1001 Bishop Street, 18th Floor, Pacific Tower, Honolulu, HI 96813, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC., | ) ) ) ) ) ) | Civil No. |
| Plaintiff(s), | ) ) | |
| vs. | ) ) | |
| RODERICK M. HILLS, FERNANDO AGUIRRE, MORTEN ARNTZEN, HOWARD W. BARKER, JR., ROBERT W. FISHER, CLARE M. HASLER, DURK I. JAGER, JAIME SERRA, STEVEN P. STANBROOK, CARL H. LINDNER, KEITH E. LINDNER, CYRUS F. FREIDHEIM, JR., WILLIAM W. VERITY, JEFFREY D. BENJAMIN, ROBERT W. OLSON, STEVEN G. WARSHAW, JEFFERY M. ZALLA, ROHIT MANOCHA, GREGORY C. THOMAS, JAMES B. RILEY, WARREN J. LIGAN, ROBERT F. KISTINGER, OLIVER W. WADDELL, FRED J. RUNK, WILLIAM A. TSACALIS, AND JOHN W. BRAUKMAN III, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant(s). | ) ) ) | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, ABUSE OF CONTROL AND ULTRA VIRES CONDUCT AND DEMAND FOR JURY TRIAL ON ALL ISSUES SO TRIABLE**

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2008 by Coughlin Stoia Geller Rudman & Robbins LLP. Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. . . . Funding a terrorist organization can never be treated as a cost of doing business . . . . American businesses must take note that payments to terrorists are of a whole different category. They are crimes.

U.S. Department of Justice Release, March 19, 2007

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action on behalf of Chiquita Brands International, Inc. ("Chiquita" or the "Company") against the entire current Chiquita Board of Directors (the "Board") and several of Chiquita's present or former officers and directors (collectively the "Chiquita Defendants"),[1] for intentional, reckless and/or negligent breaches of their fiduciary duties of care, control, compliance and candor, and/or aiding and abetting such breaches of fiduciary duty, involving illegal, improper and/or *ultra vires* conduct, including causing Chiquita to violate the laws of the United States, Colombia and international business conduct codes. This conduct includes paying, or permitting to be paid, improper and/or illegal bribes – payments to a known right-wing/fascist terrorist organization known as United Self-Defense Forces of Colombia (the "Autodefensas Unidas de Colombia" (commonly known as and referred to herein as the "AUC")), and to left-wing terrorist organizations known as The Revolutionary Armed Forces of Colombia ("FARC") and the National Liberation Army ("ELN") – and illegally providing or facilitating the provision of arms and other weapons to the AUC. This conduct was possible because Ernst & Young ("E&Y"), Chiquita's long-time (and current) outside auditor, and Robert W. Olson, the Company's long-time in-house General Counsel, acquiesced in the making or concealment of the improper or illegal payments and their mischaracterization in Chiquita's accounting books and records, and because E&Y repeatedly certified Chiquita's false and misleading financial statements

_____

[1]      When the term "Chiquita Defendants" is used herein, and its context so requires, it refers to the Chiquita officers and directors in office during the time period the allegation refers to.

distributed to its shareholders, while misrepresenting that they had been properly audited – all without either of them requiring disclosure of these illegal acts, thus furthering the false and misleading statements and breaches of fiduciary duty of the Chiquita Defendants.  As a result of this improper and illegal – indeed, criminal – conduct, Chiquita was forced to plead guilty to federal felony charges, pay a huge fine, was placed on corporate criminal probation, was sued civilly by the victims of the AUC's murderous rampage in Colombia and suffered huge losses due to the destruction of Chiquita's business operations in Colombia – once its largest source of bananas and profits.

2.     Chiquita is a publicly owned company, with operations throughout the world, including, until recently, Colombia, where its Banadex subsidiary produced bananas in the Urabá and Santa Marta regions.  Chiquita is the second largest banana producer in the world.  To exploit their positions of power, prestige and profit with Chiquita, the Chiquita Defendants have represented in annual reports to shareholders and otherwise that under their stewardship Chiquita was an ethical, law abiding corporation which was improving its operations due to the skills of its top managers, while conducting Chiquita's businesses in accordance with applicable rules and laws under their oversight.   These corporate fiduciaries assured Chiquita's public shareholders that "*[w]e communicate in an open, honest . . . manner" and "[w]e conduct business ethically and lawfully." They said that "[t]welve top operating and administrative managers of our worldwide businesses have been meeting about every two months . . . specifically to discuss our Corporate Responsibility . . . performance," and that Chiquita had a Corporate Responsibility Officer and a "Corporate Responsibility Steering Committee" that included "five directors" that "met monthly since October 1998" to oversee Chiquita's "ethical and legal behavior and compliance*."  As a result, these top managers and directors of Chiquita enjoyed – and exploited – their prestigious and

lucrative Chiquita positions, benefiting from the considerable perquisites and financial benefits their positions with one of the world's largest corporations provided.

3.     Chiquita is the present-day successor to the notorious United Fruit Company ("United Fruit"), which had a long, dark history of improper and illegal conduct.  In Central and South America it cooperated with authoritarian governments to suppress – even kill – its employees during labor protests, paid bribes, the exposure of which led to the suicide of the Company's Chairman and CEO and the enactment of the U.S. Foreign Corrupt Practices Act, fomented a coup against an unfriendly government, was implicated in illegally using child labor and in serious environmental abuses and also violated the U.S. antitrust laws.  As the Company itself has admitted:

> [I]ts predecessor companies, including the United Fruit Company, also made a number of mistakes – including the use of improper government influence, antagonism toward organized labor, and disregard for the environment.

As a result of this checkered past, it was especially important that the insider fiduciaries who were managing and overseeing Chiquita on behalf of its stockholder owners take appropriate steps to operate Chiquita in a lawful and ethical manner – not only to safeguard the value of its assets and operations, but to protect the improved reputation the Company had come to enjoy in the 1990s.  In fact, the Chiquita Defendants specifically addressed this important issue, telling the owners of the Company that Chiquita's prior unsavory behavior

> clearly would not live up to the Core Values we hold today or to the expectations of our stakeholders.
>
> ***Today, we are a different Company***.  But we acknowledge our complex past as a way to begin an honest dialogue about our present and our future.  It is humbling to consider the impacts – both positive and negative – that a corporation can have.  At the same time, it is uplifting to note the distance a company can travel.

4.     However, the true facts were quite different than these corporate fiduciaries represented to the owners of Chiquita, *i.e.*, Chiquita's shareholders, on whose behalf they were managing and overseeing the business.  In fact, Chiquita's officers and directors were encouraging and/or permitting Chiquita's executives to resort to improper and/or illegal *ultra vires* activities to

- 3 -

boost Chiquita's reported results, including bribes and other improper payments and conduct to retain the ability to operate in Colombia, Chiquita's single largest source of bananas *and* profits – thus making their stewardship of Chiquita appear more successful and providing those executives with large salaries and bonus compensation justified by that apparent success.

5.     From 1997 through 2004, the Chiquita Defendants caused Chiquita to make over 100 bribery payments to the AUC in Colombia, totaling over $1.7 million, on top of other bribery payments to the FARC and ELN, which payments were actively concealed by them from the owners of Chiquita, *i.e.*, its shareholders, and from government officials in the U.S. and Colombia. Chiquita had been making similar payments to the leftist FARC and ELN guerrillas since 1989. With the help of E&Y, they caused these payments to be falsely accounted for in Chiquita's financial records and statements as "security payments." Because of the illegal conduct of the defendants, following a March 2007 indictment, Chiquita was forced to plead guilty to a criminal violation of the U.S. Global Terrorism Sanctions Act and pay a $25 million non-tax-deductible fine – *the largest criminal penalty ever imposed under that Act*. Chiquita was also sentenced to five years criminal probation during which the Company has to meet stringent conditions or face revocation of its probation and additional criminal sanctions. *The fine was so large that Chiquita has to pay it over five years with interest, thus materially increasing the actual amount to be paid and the damage to the Company*.

6.     The AUC, often described as a "death squad," was designated as a "Foreign Terrorist Organization" by the U.S. Department of State. *Forbes* describes the AUC as "responsible for some of the worst massacres in Colombia's civil conflict and for a sizable percentage of the country's cocaine exports." With 15,000 to 20,000 armed troops, the AUC has used kidnapping, torture, disappearance, rape, murder, beatings, extortion and drug trafficking among its techniques. The paramilitary offensive began with the July 1997 killings of at least 30 civilians in Mapiripán, a coca-growing region in southeastern Colombia. Some 200 AUC paramilitaries were flown in from Urabá

to carry out the slaughter. Paramilitary killings rose dramatically while the sustaining payments from Chiquita continued. One of many massacres committed by the AUC took place in 2001, while the AUC was receiving funds from Chiquita. One morning, the AUC paramilitaries entered the rural town of Chengue and killed 24 men by smashing their skulls with stones and a sledgehammer. The AUC gained a reputation for the shocking brutality of its crimes. The slaughter left a trail of mangled corpses across the country, from the banana farms of Urabá to the coca fields of Putumayo. An overwhelming majority of the victims were civilians.

7.      This right-wing terrorist organization earns money by terrorizing workers, murdering those who seek to organize struggles for higher wages or improved conditions and threatening others that the same will happen to them if they do not submit and/or behave. Many of the victims of the AUC were human rights workers and trade unionists. Indeed, over the past six years, more than 800 union officials and organizers have been assassinated in Colombia – and more than 4,000 since 1986. Chiquita's insiders, in effect, used the right-wing paramilitaries as hit-men against their own rebellious employees and those who urged their employees to take steps to improve their working conditions. In the state of Antioquia, Chiquita's business boomed as the AUC took over banana-growing lands and was blamed for the killings of human rights workers and trade unionists. As the U.S. criminal complaint stated, "*by 2003, Banadex [Chiquita's Colombian subsidiary] was defendant Chiquita's most profitable banana-producing operation*."

8.      During one year, the AUC was accused of carrying out 16 massacres, 362 assassinations and 180 kidnappings, all of these crimes financed in part by Chiquita's funds. In addition to the payments to the AUC, Chiquita's executives facilitated the shipment of 3,000 Israeli rifles and millions of rounds of ammunition to the right-wing paramilitaries in 2001. The weapons were brought into Colombia through the port facility operated by Banadex and stored on the Company's docks before being distributed to the death squads. Colombia's attorney general has

opened an investigation into this and requested information from the U.S. Department of Justice ("DOJ").  Colombia may seek the extradition of eight Chiquita officials on charges that the Company used one of its own ships to smuggle weapons to the same paramilitary group.

9.    This is not a case of low-level, rogue employees in a far off subsidiary making improper payments which were concealed from – and thus not discovered by – senior executives or the directors of the Company, or its auditors.  These payments were known to the top corporate officers and Board of Directors, to Chiquita's in-house General Counsel and to Chiquita's outside auditors and lawyers who all were aware the payments were being made and falsely misaccounted for in Chiquita's records to conceal their true nature.  The Chiquita Defendants engaged in this wrongful *ultra vires* behavior because Chiquita's Colombian banana-producing operations were quite profitable and these corporate officers and directors were desperate to convince Chiquita's shareholders (and investors) that their management and stewardship of Chiquita was successful and they were making progress toward sustained profitable growth, despite the Company's persistent financial problems due to excessive debt levels and operational disruptions in its Latin American operations.  The improper bribery payments served the improper purpose of the Chiquita Defendants, who retained the long-term hostility to workers' rights that has given the Company a black eye for decades.  The AUC, a right-wing/fascist group engaged in terrorism, ***was killing thousands of pro-labor social activists and labor advocates in Colombia***, which the Chiquita Defendants knew would help them pressure workers in the Company's Colombian operations to accept lower wages and less desirable, *i.e.*, cheaper, working conditions.  In addition, by continuing the profitable Colombian banana operations via the improper payments and other activities, the Chiquita Defendants inflated their compensation in the form of salaries, bonuses and perks, thus personally profiting from their breaches of duty, which damaged the Company.

10.    The bribery payments to the AUC were made for over seven years, continuing after the payments were disclosed to the DOJ and even after Chiquita publicly disclosed them in mid-2004 – even though the Chiquita Defendants indicated, directly or indirectly, expressly or implicitly – but falsely – to the DOJ and the shareholders of Chiquita that the payments had stopped.  The defendants also permitted these bribery payments to continue even after the Chiquita Defendants received specific advice from Chiquita's outside counsel, Kirkland & Ellis, that the payments ***were illegal and had to stop***!  In stating that the payments were illegal and that Chiquita must immediately stop paying the AUC, this outside counsel's documents indicate it told the Chiquita Defendants:

- "Must stop payments."

- "Bottom Line:  CANNOT MAKE THE PAYMENT"

- "Concluded with: 'CANNOT MAKE THE PAYMENT'"

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

- "[T]he company should not make the payment."

11.    These illegal and/or improper actions had the desired effect, *i.e.*, increasing Chiquita's apparent success and operating profits in the short term.  Given the fact that most of the Chiquita Defendants had limited tenures in their positions at Chiquita, this was their real concern, not Chiquita's long-term profitability or reputation and goodwill, *i.e.*, the long-term interests of the actual owners of Chiquita, *i.e.*, its public shareholders.  These defendants' improper and/or unlawful actions have had an inevitable damaging impact on Chiquita, its long-term future and the interests of its shareholder community.

12.    Despite actual knowledge of the bribery payments and knowledge of or reckless disregard for the arms shipments/transactions and the obvious dangers of this improper, *ultra vires* and/or illegal conduct, Chiquita's directors permitted such conduct, including the falsification of

Chiquita's books and records in violation of the Securities Exchange Act of 1934 ("1934 Act"), to disguise and conceal the improper/illegal payments. Incredibly, they did this even though Chiquita was the subject of a Securities and Exchange Commission ("SEC") Consent Decree entered in October 2001, arising out of improper payments made by Chiquita's Banadex subsidiary in Colombia, which involved the falsification of Chiquita's books and records in violation of the 1934 Act to disguise and conceal these illegal payments, requiring Chiquita to "cease and desist" from such falsification. They did not take the steps they knew were necessary and required to remedy the dangerous conditions created by that conduct – even after the conduct became known to the DOJ. Those defendants who joined the Company as this course of conduct and conspiracy was ongoing joined in that conduct and conspiracy, allowing the conduct to continue while taking steps to conceal it and cover it up – both from Chiquita shareholders and government officials. The Chiquita Defendants' false statements, reckless or intentional misconduct and abuse of this corporation have already cost it millions of dollars in wasted compensation expense for the Chiquita Defendants, as well as fines and expenses, and exposed it to potentially hundreds of millions of dollars in civil suit damages and costs, while badly damaging Chiquita's corporate image and reputation. Chiquita's stock has plunged from over $30 per share to as low as $12.50 per share, costing its shareholder community over $750 million in lost market capitalization.

13.     When the DOJ discovered that the Chiquita Defendants were continuing to make the illegal payments – continuing a long course of improper conduct – the DOJ threatened Chiquita and the Chiquita Defendants with criminal prosecution. The Chiquita Defendants caused Chiquita to agree to plead guilty. On March 19, 2007, the DOJ issued a release entitled "Chiquita Brands International Pleads Guilty to Making Payments to a Designated Terrorist Organization, Agrees to Pay $25 Million Fine," which stated:

> Chiquita pleaded guilty pursuant to a written plea agreement. Under the terms of the plea agreement, Chiquita's sentence will include a $25 million criminal

fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation. . . .

The plea agreement arises from payments that Chiquita had made for years to the violent, right-wing terrorist organization United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"). The AUC had been designated by the U.S. government as a Foreign Terrorist Organization ("FTO") on Sept. 10, 2001, and as a Specially-Designated Global Terrorist ("SDGT") on Oct. 31, 2001. *These designations made it a federal crime for Chiquita, as a U.S. corporation, to provide money to the AUC*. . . .

"*Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. . . .*

"*Funding a terrorist organization can never be treated as a cost of doing business . . . . American businesses must take note that payments to terrorists are of a whole different category. They are crimes*."

\*        \*        \*

**Chiquita's Payments to the AUC**

\*        \*        \*

*Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees.*

For several years Chiquita paid the AUC by check through various intermediaries. *Chiquita recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services." Chiquita never received any actual security services in exchange for the payments.*

Beginning in June 2002, Chiquita began paying the AUC in Santa Marta directly and in cash according to new procedures established by senior executives of Chiquita. *The newly-implemented procedures concealed the fact that Chiquita was making direct cash payments to the AUC. A senior Chiquita officer had described these new procedures to Chiquita's Audit Committee on April 23, 2002.*

\*        \*        \*

Department of Justice officials told the Chiquita representatives that the payments were illegal and could not continue. . . .

*Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004.*

- 9 -

14.    On April 17, 2007, *The Miami Herald* published an exposé entitled "Payoffs to Colombian Terrorists Scrutinized," which stated:

> **In Colombia, Chiquita paid both left-wing and right-wing groups, according to the case files in federal court in the District of Colombia. The court documents do not specify how much money went to the leftist rebels, but say $1.7 million went to the AUC beginning in 1997** . . . .

> \*    \*    \*

> **Colombian authorities are pursuing their own investigations into Chiquita's protection payments, and have threatened to seek the extradition of Chiquita executives from the United States**. . . .

> "**I do not regard this as a relationship between a blackmailer and his victim**," Attorney General Mario Iguaran told journalists. "**What I can see is a criminal relationship**."

15.    As a result of this scandal and its criminal guilty plea, Chiquita has been sued on behalf of scores of Colombians killed by the terrorists the Chiquita Defendants caused Chiquita to fund, seeking tens of millions of dollars in damages. For instance, the families of certain individuals killed by the AUC filed a class-action lawsuit against Chiquita in this district, alleging violations of the Alien Tort Claims Act and international law. Other similar suits are pending. EarthRights International, a non-profit human rights NGO representing the plaintiffs in one of these suits, has stated:

> **Chiquita's payments to these paramilitary groups, including the United Self-Defense Committees of Colombia (Autodefensorias Unidas de Colombia, or AUC) and its predecessors, were reviewed and approved by senior executives of the corporation, and resulted in the targeted killings of hundreds or thousands of individuals, including trade unionists, banana workers, and political organizers**. . . .

> "**To promote its business operations, Chiquita funneled money and guns to a terrorist group that murdered thousands of people and shipped untold amounts of cocaine to the United States,**" said Marco Simons, ERI's Legal Director. "**Now, the victims are demanding some measure of accountability from Chiquita for its egregious behavior**."

16.    One civil complaint on behalf of victims of the AUC, filed in New Jersey, also detailed extensive links between Chiquita and the AUC that defendants had long concealed:

- 10 -

38.    *In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC*.

39.    The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

40.    Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo. The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 millions rounds of ammunition. These arms and ammunition were then transferred to the AUC.

41.    . . . *Chiquita facilitated at least four other arms shipments to the AUC. In an interview with the Colombian newspaper El Tiempo, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles*."

42.    . . . *Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC*.

17.    Not only did the Chiquita Defendants engage in illegal and/or improper conduct for their own economic benefit while in control of Chiquita, but when the DOJ threatened a criminal prosecution against them and Chiquita, the Chiquita Defendants further abused their control of Chiquita and continued to protect themselves and aggrandize their own interests at the expense – and to the damage – of Chiquita. The Chiquita Defendants did this by causing Chiquita to plead guilty and pay a huge fine *in return for a promise from the government not to prosecute the Chiquita executives involved in the illegal conduct – even though the government's Sentencing Memorandum specifically identified 10 present and former officers of Chiquita as being actively involved in the illegal payments. This action protected those executives and the Chiquita Defendants, while amaging the Company*. When Chiquita's guilty plea was first presented to the federal district court, the Judge questioned why the individuals involved had not been indicted.

However, on September 17, 2007, it became clear that Chiquita's senior officers and directors had offered Chiquita up as a sacrificial lamb – and they would be spared legal and financial responsibility for their illegal conduct which had damaged Chiquita:

> A US federal court Monday ordered the Chiquita banana company to pay 25 million dollars in fines for paying millions of dollars in protection money to Colombian paramilitary groups between 1997 and 2004.
>
> **Judge Royce Lamberth accepted an agreement between the company and the US government in March that spared company executives**.
>
> "**I order that the corporation pays a fine of 25 million dollars**," he said.
>
> <p style="text-align:center">*     *     *</p>
>
> **In accepting the fines, the prosecution agreed not to name or prosecute the executives involved in ordering the payments.**

By orchestrating events to protect the guilty executives whose active misconduct had caused Chiquita to be exposed criminally, Chiquita's directors protected themselves, and by sparing those individuals any criminal exposure and paying them off with large severance payments or continued lucrative employment to buy their silence as to the directors' complicity in the criminal conduct (a further waste of corporate assets), all the then-current directors of Chiquita abused their control of Chiquita and further breached their fiduciary duties to Chiquita.

18.     By 2002, Chiquita's insiders knew that they would have to sell off Chiquita's Colombian banana operations due to the longstanding illegal and improper conduct they had caused or permitted there.  They knew this sale would deprive Chiquita of millions of dollars in revenues from what had been one of its most profitable operations, which could hurt Chiquita's operating results and reflect very badly on the Chiquita Defendants' management and stewardship of Chiquita. Thus, to try to make up for these lost revenues and profits they knew Chiquita would soon encounter, in 2003, the Chiquita Defendants, in haste and without adequate research, investigation, evaluation or due diligence, acquired a German fruit distribution business known as Atlanta A.G. ("Atlanta"), paying a greatly excessive price.  Because of the price the Chiquita Defendants caused Chiquita to

pay for Atlanta in this hastily arranged acquisition, almost $43 million in goodwill went onto Chiquita's balance sheet. The Chiquita Defendants presented Atlanta as a very favorable acquisition – a "virtually cashless transaction" which would increase in revenues by over $1 billion a year. And, according to them, the Atlanta acquisition was a huge success. Chiquita's 2003 Annual Report stated:

> *We acquired Atlanta, exited its underperforming businesses and cut its costs. In fact, we're ahead of schedule on improving Atlanta's profitability*.

However, in truth, the reckless Atlanta acquisition was a disaster that badly damaged the Company. Almost immediately upon the acquisition of Atlanta, because of severe problems in its business, Chiquita began to write off the value of Atlanta, with charges and write-downs, which ultimately exceeded $43 million, that wiped out 100% of the goodwill recorded in connection with the Atlanta acquisition – all in less than three years.

19.     In 2004, due to the severe problems created in its Colombian operations due to the improper and illegal activities there, and hoping to reduce the likelihood of extradition of Chiquita insiders to Colombia for their criminal conduct, the Chiquita Defendants sold Chiquita's Colombian banana-producing operations in a "fire sale." This deprived Chiquita of a major source of supply of bananas necessary to conduct its business – requiring Chiquita to secure a supply of bananas by purchasing them from another source at premium, *i.e.*, unprofitable, prices. Even though those Colombian operations had been one of Chiquita's most profitable operations, *the "fire sale" of what was once a very valuable asset produced a $9 million loss when the cost of the long-term banana purchase contract is factored in*.

20.     As detailed elsewhere herein, an overwhelming majority of the current members of the Chiquita Board are hopelessly conflicted as well as potentially personally liable and as such have not and cannot comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Chiquita or vigorously prosecute them, as this would require them to sue themselves,

several of Chiquita's current executives and several former Board members and executives (who they have improperly caused Chiquita to release or agree to indemnify) who would provide inculpatory testimony as to their involvement, knowledge and malfeasance if they were sued.[2]  In fact, so as to protect themselves, the directors not only engineered the plea deal costing the Company millions while letting the responsible executives off the hook, they allowed several executives to stay in their lucrative positions of corporate trust, even though they unquestionably engaged in conduct that damaged the Company!  For example:

(a)     Aguirre, the Chairman and CEO, who lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, has failed to fire or discipline the Chiquita officers responsible for the bribery payments, and permitted and participated in causing Chiquita to plead guilty to protect the other Chiquita Defendants and in causing the fire sale of the Colombian operations, remains in his dominant and controlling position.

(b)     The Chiquita Board members have continued to permit the employment of other individuals who were actively involved in the criminal conduct, such as defendants Zalla and Kistinger, in fiduciary positions of trust and confidence at the Company.

(c)     Certain board members have made very public and resolute pronouncements condoning their own and other Company insiders' past transgressions, stating categorically there was no impropriety in making the payments to the AUC and other groups, no impropriety in continuing

---

[2]     In September 2007, the Chiquita Board announced that Howard W. Barker, Jr. had been added to the Chiquita Board as a director.  Barker has never been elected by the Chiquita shareholders.  He was hand-picked by CEO/Chairman Fernando Aguirre ("Aguirre") and the other Board members – all defendants herein – only after they were comfortable that he would not take any action adverse to them.  Because they hand picked him and because Barker spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits, sympathy toward firms like E&Y, still a defendant in the State Court derivative action, he will never sue them, and could not, in any event, since he is only one Board member and is controlled and dominated by the other Board members, defendants herein.

to make the payments even after the DOJ and Chiquita's own lawyers said they were illegal, and no impropriety in covering them up.

(d)    Members of the Audit Committee of the Chiquita Board continued approving the filing of misleading reports with the SEC that concealed the "security payments" well after the Audit Committee had been repeatedly apprised the payments were not legal.

(e)    During February - March 2007, members of the Compensation Committee of the Chiquita Board privately approved pay raises for themselves and Chiquita's senior executives complicit in the misconduct alleged herein, even as Chiquita's demise was playing out publicly.

(f)    Members of the Compensation Committee of the Chiquita Board also approved payoff packages to certain departing Chiquita executives such as Olson whose misconduct cost Chiquita tens of millions of dollars – instead of demanding contribution from them for the harm they had caused Chiquita.

21.    The current directors will not objectively consider – let alone bring or vigorously prosecute – claims against themselves or the officers of Chiquita who were actively involved in the criminal misconduct.  Because the current Board is disabled from protecting or enforcing the Company's rights in this regard, Hawaii Annuity Trust Fund for Operating Engineers, an institutional shareholder of Chiquita, brings these claims in the place and stead of the Chiquita Board of Directors to protect the Company and restore shareholder value.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(1).  The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiff and Defendants are citizens of, and domiciled in, different states.  This action does not seek to confer jurisdiction that the court would otherwise lack.

23.    Chiquita does substantial business in Washington, D.C., including directing significant marketing toward, making substantial sales in, and relying heavily upon sales revenue derived from the District of Columbia.  Defendant Hills, who was the "financial expert" of the Audit Committee and a key defendant, resides in and is a citizen of the District of Columbia.  A substantial part of the wrongdoing occurred in and/or had an effect in Washington, D.C.  The DOJ and SEC have investigated Chiquita here in Washington, D.C. for important aspects of the conduct complained of herein.  The Company is subject to a Consent Decree in this district in *Securities & Exchange Commission v. Chiquita Brands Int'l, Inc.*, No. 01-CV-2079 (D.D.C. *judgment entered* Oct. 25, 2001), and the Company's compliance with that decree is relevant to this action.  The Company recently settled the DOJ enforcement action brought in this district in *United States v. Chiquita Brands Int'l, Inc.*, No. 07-CV-0055 (D.D.C. *judgment entered* Sept. 24, 2007), which is highly relevant to the underlying claims in this action.  The allegations in this case are substantially related to the claims being prosecuted in *Sheet Metal Workers Local #218(S) Pension Fund v. Hills, et al.*, No. 07-cv-01957 (D.D.C. *filed* Oct. 30, 2007) where many of the executives named herein face significant liability for harm to Chiquita arising from the criminal payments to the AUC in Columbia.

## PARTIES AND OTHER ENTITIES

**Plaintiff**

24.    Plaintiff Hawaii Annuity Trust Fund for Operating Engineers was at relevant times a stockholder of Chiquita.  Plaintiff, a citizen of Hawaii, currently owns approximately 1,790 shares of Chiquita common stock.  Plaintiff brings this action derivatively in the right and for the benefit of Chiquita.  Plaintiff will fairly and adequately represent the interests of Chiquita and its shareholders in enforcing the rights of Chiquita.

**Nominal Defendant**

25.     (a)     Nominal defendant Chiquita Brands International, Inc. ("Chiquita") is, and has been since the 1800s, a New Jersey corporation.  Chiquita engages in the growing, distribution and sale of bananas.  Chiquita is the world's second largest banana producer, with annual revenues of approximately $4.5 billion and about 25,000 employees.  Through the late 90s, Chiquita was the world's single largest banana producer, controlling one-third of the world's banana trade.  By late 2001, due to excessive debt levels, Chiquita would enter into a "pre-arranged" or "pre-packaged" reorganization proceeding from which Chiquita emerged in the Spring of 2002.  Dole is now the largest banana producer.  The pre-reorganization equity holders of Chiquita continued to be equity holders after the reorganization.  The reorganization plan explicitly preserved Chiquita's pre-reorganization causes of action as to all persons and entities not released via the reorganization plan. The improper and illegal conduct and conspiracy alleged herein began before the Chiquita bankruptcy, continued during the Chiquita bankruptcy proceeding while being concealed from the bankruptcy court, and continued after the reorganization of Chiquita.  None of the defendants in this action were released by the reorganization plan.

(b)     Chiquita is the successor to the notorious United Fruit, which had a long, dark history of improper and illegal conduct.  In Central and South America it cooperated with authoritarian governments to suppress – even kill – its employees during labor protests.  It paid bribes, the exposure of which led to the suicide of the Company's Chairman and CEO and the enactment of the U.S. Foreign Corrupt Practices Act, and fomented a coup against an unfriendly government.  It was implicated in illegally using child labor and in serious environmental abuses and it also violated the U.S. antitrust laws.  As the Company itself has admitted:

> [I]ts predecessor companies, including the United Fruit Company, also made a number of mistakes – including the use of improper government influence, antagonism toward organized labor, and disregard for the environment.

(c)     United Fruit's control over Central American governments earlier this century gave rise to the term "banana republic." United Fruit became notorious in Latin America as a U.S. Army-backed opponent to agrarian reform and agricultural workers' unions. In 1928, several thousand workers on Colombia's banana plantations began a strike demanding written contracts, eight-hour days, six-day weeks and the elimination of food coupons. According to the United Fruit Historical Society, the strike turned into "the largest labor movement ever witnessed in the country." The strike received national attention and support. When the army fired on strikers during a demonstration in the city of Cienaga, killing up to 2,000 workers, it created unrest that contributed to the downfall of the Conservative Party.

(d)     Through much of the 20th century, the operations of United Fruit in Central America, Colombia and elsewhere in Latin America were highly questionable – as in the organization of the CIA-backed coup in Guatemala that overthrew the reformist government of Jacobo Arbenz in 1954. United Fruit was infamous for using a combination of its financial clout, congressional influence and a refusal to negotiate with striking workers to establish and maintain a colony of "banana republics" in Latin America. United Fruit/Chiquita has owned banana exporting companies in Honduras since 1899, and the U.S. Army has come to call frequently since then, first in 1903, then 1907, then 1912, 1919, and 1924. United Fruit/Chiquita workers have gone on strike more than 40 times during the 89 years the Company has operated in Honduras. Juan Pablo Wainwright, the leader of the 1903 banana workers' strike in Honduras, was assassinated in Guatemala. In 1954, massive strikes for wage increases paralyzed all banana operations and peaked with 25,0000 striking workers (around 15% of all the country's labor force). United Fruit fired 10,000 workers. In 1975, "Bananagate" struck. A federal grand jury accused United Fruit of bribing Honduran President Osvaldo Lopez Arellano. Later investigations revealed repeated bribes carried

out by the Company.  More recently, in 1992, workers went on strike to demand housing, health care and schools for their families, and an increase in salaries by 10%.

(e)    In May 1998, *The Cincinnati Enquirer* published a series of articles that exposed Chiquita's still-questionable business practices.  The articles, written by Mike Gallagher and Cameron McWhirter, reported cases in which the Company used tactics including bribery, abusive corporate control in Honduras and Colombia, the use of harmful pesticides and repressive actions against workers to bolster profits.  The writers found cases of worker and union suppression on Chiquita-controlled farms, though the "employee pamphlet" assured workers that they have the right to unionize.  In one case, the Company used the Honduran military to "evict residents of a farm village."  The soldiers forced the farmers out at gunpoint, and the village was bulldozed.  The investigation also found that Chiquita was aerially spraying workers, despite its pact with the Rainforest Alliance since November 2000, which forbids aerial spraying.  Furthermore, in defiance of the "Better Banana" pact to abide by pesticide safety standards, Chiquita subsidiaries have used pesticides in Central America that are banned in the U.S., Canada and the European Union, such as Bitertanol sold as Baycor, Chlorpyrifos, sold as Lorsban, Carboturan, sold as Furadan, and five other dangerous pesticides and fungicides.  Chiquita's insiders did not take this criticism kindly.  They caused Chiquita to sue the newspaper, claiming that reporter Gallagher obtained voice-mail tapes illegally.  *The Cincinnati Enquirer* later published an apology across the top of its front page and said it had agreed to pay Chiquita more than $10 million to avoid being sued for the series of articles that exposed the fruit company's criminal practices.  The facts found in the investigations were never challenged, however.

(f)    In October 2001, the SEC issued a "cease-and-desist order against Chiquita Brands International, Inc., in which the SEC found that Chiquita violated the books and records – Section 13(b)(2)(A) – and internal accounting controls – Section 13(b)(2)(B) – provisions of the

Securities Exchange Act of 1934 in connection with a payment to foreign customs officials by a wholly-owned foreign subsidiary of Chiquita." *SEC v. Chiquita Brands International, Inc.*, Civ. Action No. 1:01CV02079, Litigation Release No. 17169; Accounting and Auditing Enforcement Release No. 1464 (D.D.C. October 3, 2001). Chiquita consented to the entry of an order that requires Chiquita to cease and desist from violating those provisions. The SEC also filed a settled complaint in federal court seeking entry of a consent order requiring Chiquita to pay a $100,000 civil penalty. Chiquita settled the action without admitting or denying the Commission's allegations.

(g)     The order found that Chiquita violated the books and records and internal control provisions as a result of the conduct of its Colombian subsidiary, Banadex. According to the order, employees of Banadex authorized the payment of the equivalent of $30,000 to local customs officials to secure renewal of a license at Banadex's Turbo, Colombia port facility. The subsidiary's books and records incorrectly identified the two installment payments, which were made in 1996 and 1997.

(h)     Sections 13(b)(2)(A) and 13(b)(2)(B) of the 1934 Act, the "books and records" and "internal controls" provisions of the Foreign Corrupt Practices Act, require reporting companies to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect their transactions and disposition of assets, and to devise and maintain a reasonable system of internal accounting controls. Such companies are also responsible for ensuring that their wholly-owned foreign subsidiaries comply with §§13(b)(2)(A) and 13(b)(2)(B).

(i)     Based on the foregoing, the SEC concluded that Banadex employees made inaccurate entries in the documents recording the transaction and in Banadex's general ledger to conceal the payment to customs officials. These inaccurate entries by Banadex constituted a violation by Chiquita of §13(b)(2)(A) by failing to maintain books and records which accurately reflected Banadex's transactions and dispositions of assets. The SEC further found that Chiquita

violated §13(b)(2)(B) by failing to maintain a system of internal accounting controls to ensure that Banadex's books and records accurately and fairly reflected the disposition of Banadex's assets. Accordingly, the SEC, pursuant to §21C of the 1934 Act, required that Chiquita cease and desist from committing or causing any violation, and committing or causing any future violation, of §§13(b)(2)(A) and 13(b)(2)(B) of the 1934 Act.

**The Individual Defendants**

26.     The defendants named below include the entire Chiquita Board of Directors as of the filing of this Complaint.

27.     Defendant Fernando Aguirre ("Aguirre") has served as Chairman of Chiquita since May 2004 and as its Chief Executive Officer ("CEO") and President since January 2004. Aguirre received a compensation package for fiscal 2006 valued at over $3 million. On April 15, 2007 – after the Company entered into the plea agreement and suffered the Colombia and Atlanta losses – Aguirre's employment agreement was renewed and his base salary was increased more than 13% to $900,000 year with a target bonus of 130% of that annual base salary. Aguirre also received a restricted stock award of shares worth $1.2 million and an additional restricted stock grant with a targeted value of $1.6 million. His long-term incentive payment for the 2007-2009 performance period under the Chiquita Stock and Incentive Plan was set at $1.6 million. According to the Company's 2007 proxy statement, "[i]n setting 2006 base salary and annual bonus targets, the Compensation Committee considered market data derived from a ***peer group*** of 22 companies that the committee had identified . . . ***as being similarly situated to Chiquita in terms of one or more of the following: revenue, net income, asset size, market capitalization or industry***." But none of those companies is facing the litany of regulatory and legal actions that Chiquita is currently exposed to or the losses Chiquita has suffered on the Atlanta acquisition or Colombian disposition. Moreover, Aguirre's salary of $796,000 in 2006 was higher than the median CEO salary for small

cap companies, even though Chiquita underperformed the S&P 500 by 34% in 2006. Aguirre resides in and is a citizen of Ohio.

28.    Defendant Morten Arntzen ("Arntzen") has served as a director of Chiquita since 2002. Arntzen received $111,000 in directors' fees in fiscal 2006. However, employing the same "peer group" established to increase Aguirre's base salary, on February 17, 2007, despite the Board's complicity in the wrongdoing, the Board increased the cash component of their own pay by more than 60%, from $30,000 to $50,000 per year, and increased the stock component of their compensation by 100%, from an annual grant worth $25,000 to an annual grant worth $50,000, resulting in a combined directors' fee of $130,000 per year. Arntzen served with defendant Hills on Chiquita's Audit Committee that approved the payments to the AUC, the fraudulent accounting for those payments in Chiquita's books and records and the concealment of those payments in Chiquita's financial reports filed with the SEC. *The Wall Street Journal* reported in August 2007 that Arntzen said "***the AUC payments weren't secretive; they were disclosed to Ernst & Young and to company directors on the audit committee." "'When I joined the board, I knew the company was making payments to paramilitary groups in Colombia***,'" Arntzen told *The Wall Street Journal*. Arntzen resides in and is a citizen of Connecticut.

29.    Defendant Howard ("Skip") W. Barker, Jr. ("Barker") has served as a director of Chiquita since September 21, 2007, when a seventh board seat was created by the existing Board and Barker was picked by defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook to fill that seat. ***Barker has never stood for election to the Chiquita Board*** and thus has never been elected by the Chiquita shareholders. He was hand-picked by Aguirre and the other Board members – all defendants herein – only after they were comfortable that he would not take any action adverse to them. Because they hand-picked him and because Barker spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits and sympathy toward firms like

E&Y.  Barker will never sue them, and could not, in any event, since he is only one Board member and is controlled and dominated by the other Board members, defendants herein.  Barker is a resident and citizen of Connecticut and Florida.

30.     Defendant Robert W. Fisher ("Fisher") has served as director of Chiquita since 2002.  Fisher, the former President of Dole Foods, served as Chiquita's Acting Chief Operating Officer from March 2002 to August 2002.  He is an insider.  He received over $101,000 in directors' fees in fiscal 2006.  Due to the increases in directors' fees, Fisher now receives an annual fee of $130,000 per annum and other perks.  Fisher resides in and is a citizen of California.

31.     Defendant Clare M. Hasler ("Hasler") has served as a director of Chiquita since 2005.  Including the value of her stock grant, Hasler received a directors fee of over $270,000 during fiscal 2006.  Hasler receives a fee of $130,000 per annum and other perks.  Hasler resides in and is a citizen of California.

32.     Defendant Durk I. Jager ("Jager") has served as a director of Chiquita since 2002.  Jager receives a fee of $130,000 per annum and other perks.  Jager is a former CEO of Proctor & Gamble.  Jager resides in and is a citizen of Ohio.

33.     Defendant Jaime Serra ("Serra") has served as a director of Chiquita since 2003.  Serra received a directors' fee of over $101,000 for fiscal 2006 and now receives a fee of $130,000 per annum and other perks.  Serra resides in and is a citizen of Mexico.

34.     Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of Chiquita since 2002.  Stanbrook received a directors fee of over $111,000 for fiscal 2006 and now receives a directors' fee of $130,000 per annum and other perks.  Stanbrook resides in and is a citizen of Wisconsin.

35.     Defendant Carl H. Lindner ("C. Lindner") served as Chairman and CEO of Chiquita from 1984 until May 22, 2002 and August 13, 2001, respectively, having originally joined the Board

in 1976.  Through his insurance company, American Financial Group ("AFG"), Lindner controlled

nearly 40% of Chiquita's stock until after the pre-packaged bankruptcy in 2003, when his equity

interest was reduced to less than 10%.  C. Lindner resides in and is a citizen of Ohio.

36.    Defendant Keith E. Lindner ("K. Lindner"), C. Lindner's son, served as Vice

Chairman of Chiquita from 1997 until 2001.  K. Lindner served as Chiquita's President and Chief

Operating Officer from 1989 to 1997 and served in various executive capacities since 1984.  K.

Lindner was also Co-President and a director of AFG and AFC.  K. Lindner resides in and is a

citizen of Ohio and Florida.

37.    Defendant Roderick M. Hills ("Hills") served as a director of Chiquita from March

2002 until  he resigned effective May 2007.  Hills learned about the payments to the AUC (which

had been ongoing since 1998) when he joined the Board.  According to notes later produced by the

Company's outside counsel, in reaction to their warnings that the payments had to stop, Hill's

adamant position was that the payments continue – with Hills rebuking: "***just let them sue us, come***

***after us***."  Even after the DOJ learned of the bribery payments to a violent Colombian group that the

U.S. branded as terrorists, and Hills was told by the DOJ the payments were illegal, Hills refused to

curtail the payments and permitted approximately $145,000 worth of payments to be made.  On

December 22, 2003, Hills emailed fellow directors: "***we appear to [be] committing a felony***."  Since

1977, Hills has served on the boards of many scandal-plagued companies, including Federal-Mogul

Corp., Waste Management Inc. and Oak Industries Inc.  Hills learned about the payments to the

AUC in April 2002, a month after he joined the Board.  Arntzen, a director who served with Hills on

Chiquita's Audit Committee, has stated "the ***AUC payments weren't secretive; they were disclosed***

***to Ernst & Young and to company directors on the audit committee***."  "'When I joined the board, I

knew the company was making payments to paramilitary groups in Colombia,'" Arntzen has said.

Hills resides in and is a citizen of Washington, D.C.

38. Defendant Cyrus F. Freidheim, Jr. ("Freidheim") served as Chairman and CEO of Chiquita from 2002 to 2004. Freidheim resides in and is a citizen of Illinois.

39. Defendant Robert W. Olson ("Olson") served as Senior Vice President and General Counsel of Chiquita from before 1997 until he left in August 2006. Olson approved the illegal payments from early on and helped devise the scheme to conceal and miss-account for them. He provided legal counsel and advice to many of the Chiquita Defendants and Chiquita throughout the relevant time period and approved many of the false and misleading statements to Chiquita's shareholders. When Kirkland & Ellis told Chiquita, Chiquita "should STOP PAYMENTS IMMEDIATELY," Olson (and Hills) argued against stopping the payments and was involved in continuing to conceal the payments from the DOJ. Even when the DOJ told Olson in no uncertain terms on April 23, 2003 that the payments were illegal, he and Hills caused or permitted Chiquita to make more payments totaling more than $145,000 through February 2004. Olson resides in and is a citizen of Ohio.

40. Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of Chiquita from March 2002 until 2007. Benjamin was a member of Chiquita's Audit Committee during his Board membership. Benjamin resides in and is a citizen of New York.

41. Defendant William W. Verity ("Verity") served as a director of Chiquita from 1994 until March 2002. Verity served on the Board's Compensation and Audit Committees from 1998-2002 and stayed on as a director of Chiquita throughout the bankruptcy proceedings. Verity resides in and is a citizen of South Carolina.

42. Defendant Steven G. Warshaw ("Warshaw") served as a director of Chiquita from 1997 until March 2002. Warshaw also served as Chiquita's President and Chief Operating Officer from 1997-2001, as Chief Financial Officer from 1994-1998 and as Executive Vice President and

Chief Administrative Officer from 1990-1997, having served in various executive capacities at Chiquita since 1986 when the Lindners took control. Warshaw is a resident and citizen of Ohio.

43.     Defendant Jeffery M. Zalla ("Zalla") has served in various Chiquita executive positions since 1990. He has served as Senior Vice President and Chief Financial Officer of Chiquita since May 2005. From April 2005 to June 2005, Zalla served as Vice President, Finance for the Chiquita Fresh Group-North America. He served as Vice President, Treasurer, and Corporate Responsibility Officer from April 2003 to April 2005, as Corporate Responsibility Officer and Vice President, Corporate Communications from September 2001 to April 2003 and as Vice President and Corporate Responsibility Officer from October 2000 to September 2001. Zalla is a resident and citizen of Kentucky.

44.     Defendant Rohit Manocha ("Manocha") was a Thomas Weisel partner who served as a director of Chiquita between January 2001 and March 2002 when Chiquita emerged from bankruptcy. Manocha is a resident and citizen of New York.

45.     Defendant Gregory C. Thomas ("Thomas") served as a director of Chiquita from 2000 through March 2002. Previously, from 1990-1996, he had served as Executive Vice President and Chief Financial Officer of Citicasters Inc., an affiliate of AFG, until its sale by AFG in 1996. Thomas is a resident and citizen of Ohio.

46.     Defendant James B. Riley ("Riley") served as Senior Vice President and Chief Financial Officer of Chiquita from 2001 until August 2004. Riley is a resident and citizen of Ohio.

47.     Defendant Warren J. Ligan ("Ligan") served as Chief Financial Officer of Chiquita from 1998 until 2000, having previously served in various executive capacities since 1993. Ligan is a resident and citizen of California.

48.     Defendant Robert F. Kistinger ("Kistinger") has served as President and Chief Operating Officer of the Company's Chiquita Fresh Group since March 2000, having previously

served as President and Chief Operating Officer of the Company's Chiquita Banana Group from 1997 until 2000, as Senior Executive Vice President of the Chiquita Banana Group from 1994 to 1997, as President of Chiquita Banana Group-North America from 1996 to 1997, and in various other executive capacities since 1980.  Kistinger is a resident and citizen of Ohio

49.    Defendant Oliver W. Waddell ("Waddell") served as a director of Chiquita from 1994 to March 2002 and served on the Audit and Compensation Committees.  Waddell is a resident and citizen of Ohio.

50.    Defendant Fred J. Runk ("Runk") served as a director of Chiquita from 1984 until March 2002, having previously served as Vice President of Chiquita from 1984 to 1996 and Chief Financial Officer from 1984 to 1994.  Runk also served as a Senior Vice President and Treasurer of AFG and AFC.  Runk is a resident and citizen of Ohio.

51.    Defendant William A. Tsacalis ("Tsacalis") was Vice President, Controller and Chief Accounting Officer of Chiquita and currently serves at Vice President, Finance and Treasurer.  Tsacalis is a resident and citizen of Ohio.

52.    Defendant John W. Braukman III ("Braukman") was Senior Vice President of New Business Development and served as Senior Vice President and Chief Financial Officer of Chiquita until June 2005 when he was replaced by Zalla.  Braukman is a resident and citizen of Connecticut.

53.    Non-party Ronald F. Walker ("Walker") served as a director of Chiquita from 1984-1998 and as its President and Chief Operating Officer from 1984-1989.  As of 1997, Walker had also served as Vice Chairman of Great American Insurance Company, an AFG subsidiary, for more than five years.  He was President and Chief Operating Officer of AFC from 1984 until April 1995. Walker was fired in connection with the bribery charges that eventually led to the 2001 Foreign Corrupt Practices Act charges being lodged against Chiquita.  Walker passed away on May 15, 1997.

54.     Non-party Jean H. Sisco ("Sisco") served as a director of Chiquita from 1976 to April 2000 and served on the Audit and Compensation Committees. Sisco passed away in April 2000.

**Ernst & Young**

55.     Non-party E&Y has served as Chiquita's outside auditor for over a decade. E&Y received millions of dollars in auditing and other professional fees from Chiquita during the relevant period. E&Y became Chiquita's outside auditor prior to 1997. Because of the size of Chiquita and its worldwide operations, Chiquita was a prize client – an extremely lucrative account – especially for E&Y's Cincinnati, Ohio office, which had few large public company clients. As a result, the Cincinnati office of E&Y, which was in charge of E&Y's audits of Chiquita, was extremely eager to please the Chiquita Defendants and hold onto that huge account. Thus, even when E&Y learned of Chiquita's illegal bribery payments and other illegal acts in Colombia, E&Y did not make or require disclosure of them, permitted them to be miss-accounted for in Chiquita's books and records and repeatedly certified Chiquita's false and misleading financial statements, falsely reporting that it had audited them in accordance with Generally Accepted Auditing Standards ("GAAS") and that they were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP"). Plaintiff is suing E&Y derivatively on behalf of Chiquita in the Superior court of New Jersey, *Hawaii Annuity Trust Fund for Operating Engineers v. Hills*, No. C-00379-07, filed October 29, 2007. Plaintiff's claims against E&Y include aiding and abetting breaches of fiduciary duty and professional malpractice.

**Kirkland & Ellis, LLP**

56.     Non-party Kirkland & Ellis, LLP ("K&E") served as one of Chiquita's outside counsel during the relevant period. K&E has partners admitted in, represents clients in and can be found in New Jersey. K&E received millions of dollars in legal and other professional fees from Chiquita during the relevant period. From 2002 on, K&E had actual knowledge of the improper or

illegal bribery payments but did not force the Chiquita Defendants to cease making them or to make disclosure of them to the owners of Chiquita, *i.e.*, its shareholders.

## TERRORISM ACT

57.     Pursuant to Title 8, U.S.C. §1189, the Secretary of State of the United States has the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

58.     The AUC was a violent, right-wing organization in the Republic of Colombia.  The AUC was formed in or about April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government.  The AUC's activities varied from assassinating suspected guerilla supporters to engaging guerrilla combat units.  The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

59.     The Secretary of State of the United States designated the AUC as an FTO initially on September 10, 2001, and again on September 10, 2003.  As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, knowingly to provide material support and resources, including currency and monetary instruments, to the AUC.

60.     The International Emergency Economic Powers Act, 50 U.S.C. §1701, *et seq.*, conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States.  On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224.  This Executive Order prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the

United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

61.    The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. §594.201, *et seq.*, implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Colombia, was the entity empowered to authorize transactions with a SDGT. Such authorization, if granted, would have been in the form of a license.

62.    Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having first obtained a license or other authorization from the OFAC.

**DEFENDANTS' FIDUCIARY DUTIES**

63.    By reason of their positions as officers, directors and/or fiduciaries of Chiquita and because of their ability to control the business and corporate affairs of Chiquita, the Chiquita Defendants owed Chiquita and its shareholders fiduciary obligations of care, candor, compliance, fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Chiquita in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Chiquita and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

64.     Each director and officer of the Company owes to Chiquita the fiduciary duty to comply with the laws of the United States and the other countries Chiquita does business in and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Chiquita Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, and defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections and to not advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

65.     The Chiquita Defendants, because of their positions of control and authority as directors or officers of Chiquita, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Chiquita, each of the Chiquita Defendants had access to all non-public information about the financial condition, operations and future business prospects of Chiquita, including, without limitation, the illegal and improper activities which the Chiquita Defendants caused Chiquita to engage in.

66.     To discharge their duties, the officers and directors of Chiquita were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Chiquita.  By virtue of such duties, the officers and directors of Chiquita were required, among other things, to:

(a)     Manage, conduct, supervise and direct the business and internal affairs of Chiquita in accordance with the laws and regulations of the United States and every country in which Chiquita conducts business, and pursuant to the charter and bylaws of Chiquita;

(b)     Neither violate nor knowingly permit any officer, director or employee of Chiquita to violate applicable laws, rules and regulations;

(c)     Remain informed as to the status of Chiquita's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Chiquita and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Chiquita's operations would comply with all applicable anti-bribery and corruption laws, Chiquita's financial statements and information filed with U.S. financial regulators and disseminated to the public and to Chiquita shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)     Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Chiquita by the officers and employees of Chiquita and any other reports or other information required by law from Chiquita and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Chiquita and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.     During all times relevant hereto, each of the Chiquita Defendants occupied positions with Chiquita or was associated with the Company in such a manner as to make him or her privy to

confidential and proprietary information concerning Chiquita, its operations, finances and financial condition.  Because of these positions and such access, each of the Chiquita Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from Chiquita's shareholders.  The Chiquita Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to disclose material information regarding Chiquita and to take any and all actions necessary to ensure that the officers and directors of Chiquita do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

## FACTUAL ALLEGATIONS

**The Chiquita Defendants' False and Misleading
Reports to the Owners of Chiquita**

68.     In an effort to present themselves as competent, honest stewards and managers of Chiquita's business, the Chiquita Defendants have repeatedly misrepresented how they were overseeing, managing and operating Chiquita in a lawful and ethical manner and that Chiquita had in place internal accounting and financial and other controls to assure its accounting procedures were proper and it was in compliance with anti-corruption and anti-bribery laws and had effective training programs for its executives and managers in this regard, and, as a result, it was in compliance with laws and conventions.  These representations were false and misleading.  Under their stewardship, the Chiquita Defendants have caused Chiquita to engage in a pattern and practice of making illegal and improper bribery payments and engaging in other illegal activities in Colombia and making false and misleading statements to conceal and cover them up, violating U.S. and foreign law. Defendants' misconduct also involved repeatedly misleading Chiquita's shareholders to entrench and enrich themselves by boosting Chiquita's apparent short-term results and to justify paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage Chiquita in the longer term.

69.    For many years in their Annual Reports and other communications with shareholders, Chiquita's directors have stressed their successful management and oversight of Chiquita, its ethical behavior and compliance with laws.  These representations were false and misleading and made with reckless disregard for the truth by the directors issuing them.  The Annual Reports to Chiquita shareholders set forth below were each false and misleading for failing to disclose the existence and nature of the Colombian payments, the falsification of Chiquita's financial statements, the circumvention of, and/or material weakness in, Chiquita's internal financial and accounting and disclosure controls, Chiquita's other improper activities in Colombia, the Chiquita Defendants' *ultra vires* conduct, Chiquita's unethical conduct and that the primary reason for Chiquita's apparent progress in its business and objectives and its better performance was the improper, unethical and *ultra vires* conduct which could not continue indefinitely.

70.    The statements in Chiquita's Annual Reports specified below were known to be false by the then directors and officers of Chiquita when those statements were made.  Chiquita operates in a competitive environment.  To justify the continuation of their lucrative and prestigious executive and directoral positions, the Chiquita Defendants wanted to make it appear that Chiquita was succeeding under their stewardship and doing so by operating in an ethical manner, in compliance with the laws applicable to it.  The repeated positive and reassuring statements about Chiquita's controls, procedures and practices to comply with laws, rules and conventions, Chiquita's actual compliance with them, and Chiquita's dedication to high ethical standards were false.  In fact, Chiquita's top officers and directors were permitting the circumventing of those preventative procedures and controls by permitting the payment of bribes and other improper payments and illegal arms shipments, *i.e.*, unethical, *ultra vires* and illegal activities.  Chiquita's financial statements, published by, and the responsibility of, its directors, were also false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make

provision for the monetary fines, penalties and damages that would inevitably result from those payments.

71.    In Chiquita's 1997 Annual Report to Shareholders, the "Executive Message," signed by C. Lindner, K. Lindner and Warshaw, stated:

> We firmly believe in the strength of the Chiquita brand and remain committed to achieving the Company's full earnings potential.
>
> *        *        *
>
> We continue to make measurable progress toward objectives which further the realization of Chiquita's earnings capacity.

Elsewhere, the 1997 Annual Report stated:

> **Chiquita's corporate values balance good citizenship and social responsibility with profitable business growth. . . .  The Company has a strong commitment to ethical, social . . . standards** . . . .
>
> *        *        *
>
> Consumers worldwide are concerned about . . . social issues.  They expect companies to fulfill their responsibilities of global citizenship. . . .  **Chiquita welcomes the interest in ethical standards and pledges to continue improving . . . social conditions where the Company operates**.

72.    The 1997 Annual Report contained the following:

**Statement of Management Responsibility**

> The financial information presented in this Annual Report is the responsibility of Chiquita Brands International, Inc. management, which believes that it presents fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.
>
> The Company's system of internal accounting controls, which is supported by formal financial and administrative policies, is designed to provide reasonable assurance that the financial records are reliable for preparation of financial statements and that assets are safeguarded against losses from unauthorized use or disposition.  Management reviews, modifies and improves these systems and controls as changes occur in business conditions and operations.  The Company's worldwide internal audit function reviews the adequacy and effectiveness of controls and compliance with policies.
>
> The Audit Committee of the Board of Directors reviews the Company's financial statements, accounting policies and internal controls.  In performing its

reviews, the Committee meets periodically with the independent auditors, management and internal auditors to discuss these matters.

73.     With respect to the risks associated with Chiquita's Central and South American operations, the 1997 Annual Report stated:

> Chiquita's earnings are heavily dependent upon products grown and purchased in Central and South America. These activities, a significant factor in the economies of the countries where Chiquita produces bananas and related products, are subject to the risks that are inherent in operating in such foreign countries, including government regulation, currency restrictions and other restraints, risk of expropriation and burdensome taxes.

74.     Chiquita's 1998 Annual Report stated:

> Chiquita is a responsible corporate citizen to a broad community of our customers, consumers, employees and neighbors.

75.     The "Executive Message" in the 1998 Annual Report signed by C. Lindner, K. Lindner and Warshaw stated:

> Chiquita Brand International's 1998 operating results reflect continued progress . . . .

>                     *          *          *

> Higher banana farm productivity has contributed significantly to recent cost improvements.

76.     Chiquita's 1998 and 1999 Annual Reports contained the same "Statement of Management Responsibility" and the same statement regarding the risks of its Central American operations as those in its 1997 Annual Report.

77.     Chiquita's 2000 Annual Report to Shareholders contained the same "Statement of Management Responsibility" and same statement regarding the risks of Chiquita's Central American operations as the 1997 Annual Report, which statements were false and misleading for the same reasons.

78.     During 2000, Chiquita published a "Corporate Responsibility Report." It stated in a letter signed by Warshaw:

**A New Spirit of Openness:  Letter from Steve Warshaw**

To some, this Report may seem like it was along time coming.

The Chiquita of today emerged, over the course of 100 years, from companies holding various names, including the United Fruit Company and United Brands. . . .

But along the way, the United Fruit Company became known as "the octopus," an organization reputed to have such broad reach and influence that it could hold sway over governments and the lives of its employees.  This reputation was born of many things, including allegations of the Company's participation in labor rights suppression in Colombia in 1928 and involvement in a government overthrow in Guatemala in 1954, as well as its involvement in a bribery scandal in Honduras in 1975.  And in the years since, some would argue that the Company has been closed and defensive in addressing concerns about its standards and practices.  In the eyes of many, all of this casts a shadow, even today, over the Company.

*Times have changed.  And so has our Company*.

Our stakeholders expect more of us.  We expect more of ourselves.  Our understanding of our role in society, and what it means to be a responsible corporate citizen, is quite different than it was not long ago.

*Three years ago, in the wake of particularly damaging media coverage, we embarked on a disciplined path toward Corporate Responsibility*. . . .  This was not to be a public relations exercise, *but a management discipline* – a way to align ourselves around a set of Core Values, to build a sense of common purpose across our different units, and to get the best out of our people.

\*        \*        \*

We have learned that building trust demands a new spirit of openness and honesty within the Company, and that earning the trust of our many stakeholders is vital to our success.

\*        \*        \*

*Of course there is compelling moral value to this work.  But it also makes smart business sense*. . . .

79.    Elsewhere the 2000 Corporate Responsibility Report stated:

–        **Our Core Values and Code of Conduct** – These standards are the cornerstones of our commitment to Corporate Responsibility.  Our Core Values guide our strategic business decisions and help us balance the needs of our stakeholders, and our Code of Conduct translates these Values into everyday behaviors.

\*        \*        \*

*INTEGRITY*

We live by our Core Values

***We communicate in an open, honest and straightforward manner***

***We conduct business ethically and lawfully***

80.      In the 2000 Corporate Responsibility Report, the Chiquita Defendants told the owners of the Company that they had in place a series of controls, committees and procedures that ensured compliance with these core values:

**Creating Governance:  Support and Accountability**

Governance Structure

Chiquita's commitment to Corporate Responsibility begins at the top of the organization and is supported by a governance structure designed to provide guidance, resources, and accountability ***for the responsible conduct of employees in their everyday jobs***.

Audit Committee

In 2000, we expanded the role of the Audit Committee of the Company's Board of Directors to include oversight of whether the Company has the right people, policies and programs in place to properly manage Corporate Responsibility.  The Audit Committee has three members, all of whom are outside directors.  The Company's Corporate Responsibility Officer has open access to Audit Committee members and reports to them periodically as part of regularly scheduled Committee meetings.

Senior Management Group for Corporate Responsibility

The effective achievement of our standards is the responsibility of our senior management.  Twelve top operating and administrative managers of our worldwide businesses have been meeting about every two months since October 1998 specifically to discuss our Corporate Responsibility strategy and performance.  These senior managers are responsible for providing vision and effective leadership for Corporate Responsibility, modeling our Core Values in their personal behavior, and holding the organization accountable for achieving credible progress toward our objectives.

Corporate Responsibility Officer

In May 2000, Chiquita appointed a full-time Vice President and Corporate Responsibility Officer.  The role of the Corporate Responsibility Officer is to oversee the design, implementation, management, and improvement of Corporate Responsibility practices throughout the Company.  He is also responsible for the

development of measurement, verification, accountability, communication, and reporting systems. *He serves as an internal resource for best practices in Corporate Responsibility, communicates with stakeholders about the Company's performance, and tracks emerging issues of importance to the Company and its stakeholders. He reports to the President and Chief Executive Officer*.

Jeff Zalla is a ten-year Chiquita employee and has led our Corporate Responsibility Steering Committee since its inception in 1998.

Corporate Responsibility Steering Committee

The Senior Management group is currently supported by a Corporate Responsibility Steering Committee, which includes the Corporate Responsibility Officer, the Vice President of Human Resources, *five directors* and managers from representative Chiquita business units, and one rotating member of Senior Management. This group has met monthly since October 1998 and has contributed enormously to the design and implementation of our Corporate Responsibility efforts. The Steering Committee has worked to ensure that our strategies and objectives are appropriate and that our tools for assessment and planning are effective for all business units. It has also engaged other corporate functions such as Legal, Human Resources and our environmental group in efforts to integrate Corporate Responsibility into our everyday management practices.

\*       \*       \*

Our Code of Conduct

Our Code of Conduct translates our Core Values into everyday behaviors. *For decades, Chiquita has had a Code of Conduct that dealt with ethical and legal behavior and compliance with Company policies. . . . Our Code of Conduct now embodies standards in the areas* of food safety, labor standards, employee health and safety, community involvement, environmental protection, *ethical behavior, and legal compliance*.

81.    Chiquita's 2001 Annual Report stated:

We made considerable progress on corporate responsibility, breaking new ground with our first Corporate Responsibility Report (www.chiquita.com), which earned praise for its honesty, transparency and measurement against rigorous third-party environmental and social standards. *As a Company, we will continue to be guided by Chiquita's Core Values of integrity, respect, opportunity and responsibility in our dealings with shareholders, employees, customers, suppliers and the communities in which we do business*.

For 2001, Chiquita reported $155 million earnings . . . (EBITDA) . . . [and] an improvement of 7% over the previous year. . . .

. . . We are confident that . . . our industry-leading production capabilities in Latin America, and the Chiquita brand, which is among the best-known and most respected brands in the world, provide us a strong platform for growth.

- 39 -

82.     Chiquita's 2001 Annual Report contained the same "Statement of Management Responsibility" and same statement regarding the risks of its Central and South American operations as the 1997 Annual Report, which statements were false and misleading for the same reasons. Chiquita's 2001 Corporate Responsibility Report contained essentially the same statements as the 2000 Corporate Responsibility Report, which were false and misleading for the same reasons.

83.     Chiquita's 2002 Annual Report contained a letter from Chairman Freidheim stating:

Net sales for 2002 on a combined basis totaled $2.0 billion, up six percent from 2001.

\*       \*       \*

**Here's what we're doing to improve corporate responsibility**. In 2002, Chiquita again demonstrated its commitment to high . . . social standards. . . . ***Our corporate responsibility reports also continue to earn recognition for their honesty, transparency and clear performance measurement***. Our first report was ranked best in the world among food companies by SustainAbility and the United Nations Environmental Program, and our second report shared the first-ever award for outstanding sustainability reporting from a coalition of more than 80 environmental and investment groups. I encourage you to review our corporate responsibility reports at www.chiquita.com.

***We are committed to managing Chiquita to the highest standards of integrity and propriety in all our affairs, from our farms to our boardroom. Our achievements are a great source of price among our employees***.

***We have confidence in Chiquita's turnaround***.

84.     Elsewhere the 2002 Annual Report stated:

**Why Are You Continuing to Invest in Corporate Responsibility?**

. . . [I]n 1998, Chiquita took on corporate responsibility as a major priority following years of criticism from nongovernmental organizations and the media. ***Management decided to turn around the company's reputation***.

\*       \*       \*

***In delivering on our corporate responsibility goals, we have gone from being a target of criticism to a focal point of praise***. We could not buy that kind of turnaround in corporate reputation. We can only earn it, by committing to high standards and living up to them. . . . [W]e continue to invest in corporate responsibility because it is the right thing to do.

\*       \*       \*

Integrity

- ***We live by our Core Values***.

- ***We communicate in an open, honest and straightforward manner***.

- ***We conduct business ethically and lawfully***.

85.    Chiquita's 2002 Annual Report contained the same "Statement of Management Responsibility" and same statement regarding the risks of the Company's Central and South American operations as the 1997 Annual Report, which were false and misleading for the same reasons.

86.    Chiquita's 2003 Annual Report contained a letter from Aguirre and Freidheim, which stated:

> ***We also accomplished new milestones in corporate responsibility*** . . . .
>
> *        *        *
>
> ***2003 was an excellent year for Chiquita*** . . . .  ***The turnaround of Chiquita is well underway*** . . . .
>
> Revenue in 2003 was $2.6 billion . . . .  Approximately 80 percent of the $1 billion increase in 2003 revenue from 2002 was due to our acquisition in March of Atlanta AG, a German fresh produce distributor.  Operating income for 2003 rose to $140 million . . . .
>
> *        *        *
>
> ***We are very pleased with Chiquita's achievements in 2003*** . . . .

87.    Elsewhere, the 2003 Annual Report stated in a Q/A session:

> A.        As I explained earlier, I believe in decisions made on the basis of values and principles.  ***I am impressed by Chiquita's Core Values and the company's accomplishments in corporate responsibility***.  Chiquita's high standards of . . . social performance enhance the company's reputation and ultimately its brand. There are a growing number of investors who seek companies with track records in corporate responsibility.  Chiquita should benefit from this trend.  I will continue to support our corporate responsibility program, because it is the right thing to do and it is good for Chiquita and our stakeholders.

88.    Elsewhere, the 2003 Annual Report stated:

OUR COMMITMENT TO ACHIEVE HIGH STANDARDS OF ENVIRONMENTAL, SOCIAL AND ETHICAL PERFORMANCE IS ROOTED IN OUR CORE VALUES – INTEGRITY, RESPECT, OPPORTUNITY AND RESPONSIBILITY – WHICH, ALONG WITH OUR CODE OF CONDUCT, GUIDE OUR LONG-TERM STRATEGIES AND EVERYDAY ACTIONS.

89.    Chiquita's 2003 Annual Report contained the same "Statement of Management Responsibility" and same statement regarding the risks of the Company's Central and South American operations as the 1997 Annual Report, which were false and misleading for the same reasons.

90.    The 2003 Annual Report also stated:

In January 2004, the Company confirmed it is having discussions regarding the potential sale of its banana-producing and port operations in Colombia to Invesmar Ltd., the holding company of C.I. Banacol S.A., a Colombian-based producer and exporter of bananas.

91.    Chiquita's 2003 Annual Report also stated:

The Company has international operations in many foreign countries, including those in Central and South America, the Philippines and La Côte d'Ivoire. The Company must continually evaluate the risks in these countries, including Colombia, where an unstable environment has made it increasingly difficult to do business. The Company's activities are subject to risks inherent in operating in these countries, including government regulation, currency restrictions and other restraints, burdensome taxes, risks of expropriation, threats to employees, political instability and terrorist activities, including extortion, and risks of action by U.S. and foreign governmental entities in relation to the Company. *Should such circumstances occur, the Company might need to curtail, cease or alter its activities in a particular region or country. Chiquita's ability to deal with these issues may be affected by applicable U.S. laws. The Company is currently dealing with one such issue, which it has brought to the attention of the appropriate U.S. authorities who are reviewing the matter. Management currently believes that the matter can be resolved in a manner that is not material to the Company, although there can be no assurance in this regard*.

No disclosure was made of the illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

92.    On May 10, 2004, the Chiquita Defendants caused Chiquita to issue a release stating:

DEPARTMENT OF JUSTICE INVESTIGATION

In April 2003, the company's management and audit committee, in consultation with the board of directors, voluntarily disclosed to the U.S. Department of Justice that the company's banana producing subsidiary in Colombia has been forced to make "protection" payments to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The company's *sole reason* for submitting to these payment demands has been to protect its employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Justice Department was made because the company's management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the Justice Department's guidance. Following the voluntary disclosure, the Justice Department undertook an investigation. The company has cooperated with that investigation.

Recently, the Department advised that, as part of the investigation, it will be evaluating the role and conduct of the company and some of its officers. The company cannot predict the outcome of the investigation or its possible effect on the company or its Colombian subsidiary.

93.     Chiquita's 2004 Annual Report discussed the now-disclosed Colombia payments and

the DOJ investigation, stating:

FACING A NEW CHALLENGE IN COLOMBIA

In May 2004, Chiquita announced that the company's management and audit committee, in consultation with the board of directors, had voluntarily disclosed to the U.S. Department of Justice more than a year earlier that the company's banana producing subsidiary in Colombia had been forced to make protection payments to certain groups in that country. The company's sole reason for submitting to these payment demands was to protect employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Department of Justice was made because management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the department's guidance. Following the voluntary disclosure, the Department of Justice undertook an investigation, with which the company has cooperated. To date, this investigation has not concluded and the company cannot predict its outcome. Chiquita sold its Colombian banana-producing and port operations to a local producer and exporter of bananas in June 2004.

*     *     *

The Company is currently dealing with one such issue involving protection payments that its Colombian banana producing subsidiary (sold in June 2004) had been forced to make to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The Company's management and its audit committee, in consultation with the board of directors, voluntarily disclosed this issue to the U.S. Department of Justice in April 2003 and requested its guidance. In late March 2004, the Department of Justice advised that, as part of its investigation, it would be evaluating the role and conduct of the Company and some of its officers in the matter. The Company intends to continue its cooperation with this investigation, but it cannot predict the outcome or any possible adverse effect on the Company, which could include the imposition of fines.

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations. The stated "sole" reason for the payments was false, as the payments were being made because the AUC's activities were helping the Chiquita Defendants control labor conditions in Colombia and to boost the Chiquita Defendants' bonuses.

94.    Chiquita's 2004 Annual Report contained the following "Statement of Management Responsibility," signed by Aguirre, Braukman and Tsacalis:

The financial statements and related financial information presented in the Annual Report are the responsibility of Chiquita Brands International Inc. management, which believes that they present fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The Company's management is responsible for establishing and maintaining adequate internal controls. The Company has a system of formal accounting controls, which includes internal control over financial reporting and is supported by internal financial and administrative policies. This system is designed to provide reasonable assurance that the Company's financial records can be relied on for preparation of its financial statements and that its assets are safeguarded against loss from unauthorized use or disposition.

The Company also has a system of disclosure controls and procedures designed to ensure that material information relating to the Company and its consolidated subsidiaries is made known to the Company representatives who prepare and are responsible for the Company's financial statements and periodic reports filed with the Securities and Exchange Commission ("SEC"). The effectiveness of these disclosure controls and procedures is reviewed quarterly by management, including the Company's Chief Executive Officer and Chief Financial

Officer.   Management modifies and improves these disclosure controls and procedures as a result of the quarterly reviews or as changes occur in business conditions, operations or reporting requirements.

The Company's worldwide internal audit function, which reports to the Audit Committee, reviews the adequacy and effectiveness of controls and compliance with the Company's policies.

The Audit Committee of the Board of Directors consists solely of directors who are considered independent under applicable New York Stock Exchange rules. One member of the Audit Committee, Roderick M. Hills, has been determined by the Board of Directors to be an "audit committee financial expert" as defined by SEC rules  The Audit Committee reviews the Company's financial statements and periodic reports filed with the SEC, as well as the Company's internal control over financial reporting including its accounting policies.  In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors, both together and separately, to discuss these matters.

The Audit Committee engages Ernst & Young, an independent registered accounting firm, to audit the Company's financial statements and its internal control over financial reporting and express opinions thereon.  The scope of the audits is set by Ernst & Young, following review and discussion with the Audit Committee. Ernst & Young has full and free access to all Company records and personnel in conducting its audits.  Representatives of Ernst & Young meet regularly with the Audit Committee, with and without members of management present, to discuss their audit work and any other matters they believe should be brought to the attention of the Committee.  Ernst & Young has issued an opinion on the Company's financial statements.  This report appears on page 33.  Ernst & Young has also issued an audit report on management's assessment of the Company's internal control over financial reporting.  This report appears on page 34.

### MANAGEMENT'S ASSESSMENT OF THE COMPANY'S INTERNAL CONTROL OVER FINANCIAL REPORTING

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. ***Based on management's assessment, management believes that, as of December 31, 2004, the Company's internal control over financial reporting was effective based on the criteria in Internal Control-Integrated Framework***.

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

- 45 -

95.    Chiquita's 2005 Annual Report contained the following "Statement of Management Responsibility," signed by Aguirre and Zalla:

The financial statements and related financial information presented in this Annual Report are the responsibility of Chiquita Brands International Inc. management, which believes that they present fairly the company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The company's management is responsible for establishing and maintaining adequate internal controls.  The company has a system of internal accounting controls, which includes internal control over financial reporting and is supported by formal financial and administrative policies.  This system is designed to provide reasonable assurance that the company's financial records can be relied on for preparation of its financial statements and that its assets are safeguarded against loss from unauthorized use or disposition.

The company also has a system of disclosure controls and procedures designed to ensure that material information relating to the company and its consolidated subsidiaries is made known to the company representatives who prepare and are responsible for the company's financial statements and periodic reports filed with the Securities and Exchange Commission ("SEC").  The effectiveness of these disclosure controls and procedures is reviewed quarterly by management, including the company's Chief Executive Officer and Chief Financial Officer.  Management modifies and improves these disclosure controls and procedures as a result of the quarterly reviews or as changes occur in business conditions, operations or reporting requirements.

The company's worldwide internal audit function, which reports to the Audit Committee, reviews the adequacy and effectiveness of controls and compliance with the company's policies.

Chiquita has published its Core Values and Code of Conduct which establish the company's high standards for corporate responsibility.  The company maintains a hotline, administered by an independent company, that employees can use to confidentially and anonymously communicate suspected violations of the company's Core Values or Code of Conduct, including concerns regarding accounting, internal accounting control or auditing matters.  All reported accounting, internal accounting control or auditing matters are forwarded directly to the Chairman of the Audit Committee of the Board of Directors.

The Audit Committee of the Board of Directors consists solely of directors who are considered independent under applicable New York Stock Exchange rules. One member of the Audit Committee, Roderick M. Hills, has been determined by the Board of Directors to be an "audit committee financial expert" as defined by SEC rules.  The Audit Committee reviews the company's financial statements and periodic reports filed with the SEC, as well as the company's internal control over financial reporting including its accounting policies.  In performing its reviews, the

Committee meets periodically with the independent auditors, management and internal auditors, both together and separately, to discuss these matters.

The Audit Committee engages Ernst & Young, an independent registered public accounting firm, to audit the company's financial statements and its internal control over financial reporting and express opinions thereon. The scope of the audits is set by Ernst & Young, following review and discussion with the Audit Committee. Ernst & Young has full and free access to all company records and personnel in conducting its audits. Representatives of Ernst & Young meet regularly with the Audit Committee, with and without members of management present, to discuss their audit work and any other matters they believe should be brought to the attention of the Committee. Ernst & Young has issued an opinion on the company's financial statements. This report appears on page 42. Ernst & Young has also issued an audit report on management's assessment of the company's internal control over financial reporting. This report appears on page 43.

### MANAGEMENT'S ASSESSMENT OF THE COMPANY'S INTERNAL CONTROL OVER FINANCIAL REPORTING

The company's management assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2005. Based on management's assessment, management believes that, as of December 31, 2005, the company's internal control over financial reporting was effective based on the criteria in *Internal Control-Integrated Framework*, as set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

96.     Chiquita's 2005 Annual Report discussed the Colombian situation and the DOJ investigation:

In April 2003, the company's management and audit committee, in consultation with the board of directors, voluntarily disclosed to the U.S. Department of Justice, Criminal Division (the "Justice Department"), that its former banana producing subsidiary in Colombia, which was sold in June 2004, had been forced to make "protection" payments to certain groups in that country which had been designated under United States law as foreign terrorist organizations. The company's sole reason for allowing its subsidiary to submit to these payment demands had been to protect its employees from the risks to their safety if the payments were not made. The voluntary disclosure to the Justice Department was made because the company's management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime

to support such an organization. The company requested the Justice Department's guidance. Following the voluntary disclosure, the Justice Department undertook an investigation, including consideration by a grand jury. The company has cooperated with that investigation. In March 2004, the Justice Department advised that, as part of its criminal investigation, it will be evaluating the role and conduct of the company and some of its officers in the matter. In September-October 2005, the company was advised that the investigation is continuing and that the conduct of the company and some of its officers and directors remains within the scope of the investigation. The company intends to continue its cooperation with this investigation, but it cannot predict its outcome or any possible adverse effect on the company (including the materiality thereof), which could include the imposition of fines and/or penalties.

97.    Chiquita's 2005 Annual Report contained a section entitled "Corporate Responsibility," which stated:

> Our Core Values – Integrity, Respect, Opportunity and Responsibility – guide our daily decisions, and our Code of Conduct clearly defines our standards for corporate responsibility  In addition to strict legal compliance, we define corporate responsibility to include social responsibilities, such as respect for the environment and the communities where we do business, the health and safety of our workers, labor rights and food safety.  We see a clear link between our Core Values and our company's vision, mission and sustainable growth strategy.

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

98.    Chiquita's 1997-2005 financial statements as published by the Chiquita Defendants and distributed to the owners of the business, *i.e.*, Chiquita's shareholders, were false and misleading in failing to disclose the Chiquita Defendants' improper, wasteful and *ultra vires* payments (and the continuation thereof after the DOJ found out about them), as well as the huge contingent liabilities those payments exposed Chiquita to, including large criminal or civil penalties and the diminution of the value of Chiquita's Colombian operations.

**Improper/Illegal Payments**

99.     From around 1989 through 1997, Chiquita had improperly paid bribes to two violent, left-wing terrorist organizations in Colombia, *i.e.*, the FARC and ELN.  After having previously made improper and *ultra vires* bribery payments to the ELN and FARC for several years, from 1997 through February 2004, Chiquita, through its Colombian subsidiary, Banadex, made improper or illegal and *ultra vires* payments to a violent, right-wing terrorist organization in Colombia, the AUC.  The AUC was formed around April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government.  Defendants caused or permitted Chiquita to make payments to the AUC, directly or indirectly, nearly every month from 1997 through February 2004, making over 100 payments totaling over $1.7 million.  Thus, the Chiquita Defendants caused Chiquita to pay money to Colombian terrorist organizations for approximately 15 years, all of which payments were *ultra vires*, improper or illegal under U.S. or Colombian law.

100.     Starting in 1997, Chiquita made payments to two different components of the AUC in the Urabá and Santa Marta regions, where Chiquita had its Colombian operations. Chiquita made these payments through Banadex.  Chiquita's payments to the FARC and the ELN had been in those same regions.

101.     Initially, Chiquita made the payments to the AUC through an intermediary known as a "*convivir.*"[3]  Later, Chiquita began paying the AUC in Urabá by check through a *convivir.* Chiquita routinized the payments. Sometime in 1998 or 1999, Chiquita began making payments to the AUC in the Santa Marta region.

---

[3]     "*Convivirs*" were private security companies licensed by the Colombian government to assist the local police and military in providing security. Notwithstanding their intended purpose and apparent legal authority under Colombian law, the AUC used certain *convivirs* as fronts to collect money from businesses to support its illegal activities.

102.    For several years Chiquita paid the AUC by check through various *convivirs* in both the Urabá and Santa Marta regions. The checks were nearly always made out to the *convivirs* and were drawn from the Colombian bank accounts of Chiquita's subsidiary. No *convivir* ever provided Chiquita or Banadex with any actual security services or actual security equipment in exchange for the payments, such as security guards, security guard dogs, security patrols, security alarms, security fencing, or security training.  Defendants caused or permitted Chiquita to improperly record these payments in its corporate books and records as "security payments," payments for "security," or "security services," so as to conceal the improper and/or illegal nature of the payments.  From the outset, officers of Chiquita and Banadex recognized that these payments were illicit and improper. That is why they continued to misaccount for them.

103.    Chiquita's payments to the AUC were reviewed and approved by high-ranking officers and directors.  They knew that the Company was paying the AUC and that the AUC was a violent, paramilitary organization.  An in-house attorney for Chiquita conducted a review of the payments in August 2000 and prepared a memorandum detailing that review.  The memorandum recognized that the *convivir* was merely a front for the AUC and described the AUC as a "***widely-known, illegal vigilante organization***."

104.    The in-house attorney presented the results of his review to the Audit Committee of the Board, which operated as the agent of the full Board in September 2000.  There was no instruction to stop the payments or to report the payments to United States or Colombian authorities.  Notwithstanding the knowledge of senior officers and directors that the Company was making regular payments to a violent, paramilitary organization, Chiquita continued to make payments to the AUC.

105.    On September 10, 2001, the AUC was designated as an FTO by the United States Department of State, making Chiquita's payments to the AUC illegal under the material support

statute, 18 U.S.C. §2339B. On October 31, 2001, the AUC was designated as a Specially-Designated Global Terrorist by the United States Department of the Treasury's OFAC, making the payments illegal under the International Emergency Economic Powers Act, 50 U.S.C. §1705(b), and the underlying Global Terrorism Sanctions Regulations, 31 C.F.R. §594.204.

106.    After at least 2000, Chiquita's payments to the AUC were reported to the Audit Committee of the Board of Directors, the agent of the full Board, on a quarterly basis. Throughout the duration of the payments to the AUC, Chiquita recorded them in its books and records as "security payments" or payments for "security services" to a specifically named *convivir,* even after it was known to senior officers and directors that no *convivir* was providing Chiquita or Banadex with any security services in Colombia and the *convivirs* were simply fronts for the terrorist organization.

107.    In late March 2002, senior officers of Chiquita established new procedures for paying the AUC in Santa Marta directly in cash and keeping a private ledger of these cash payments.[4] The procedures involved paying a senior officer of Banadex additional "income" from the Banadex general manager's fund. That money, in turn, was provided to an employee of Banadex, who delivered the cash directly to the AUC in Santa Marta. The senior Banadex officer reported this additional "income" on his Colombian tax return, and Banadex increased the payments to him to cover this additional personal tax liability. On April 23, 2002, these new procedures were reviewed at a meeting of the Audit Committee of the Board of Directors, the agent of the full Board, in Chiquita's Cincinnati headquarters. The procedures were implemented beginning in June 2002.

---

[4]    Chiquita changed its method of payment to the AUC in Santa Marta several times. Initially, Chiquita paid the AUC through a *convivir* located in Santa Marta. Later, Chiquita made combined payments to a *convivir* in Urabá, with the payments shared between the AUC components in Urabá and Santa Marta. Eventually, the AUC in Santa Marta received direct cash payments.

108.    Chiquita's corporate books and records never reflected that the ultimate and intended recipient of these funds was the AUC. With respect to the payments to the AUC in Urabá, the books and records only identified payments to various *convivirs*. With respect to the payments to the AUC in Santa Marta, the private ledger only identified the transfer of funds from the senior Banadex officer to the Banadex employee.

109.    The Chiquita Defendants caused Chiquita to continue to pay the AUC even after the payments were brought directly to the attention of its senior executives and Board members during a Board meeting held in September 2000. Chiquita continued to pay the AUC after the United States designated the AUC as an FTO on September 10, 2001, and as a Specially-Designated Global Terrorist on October 30, 2001. Chiquita continued to pay the AUC after gaining direct knowledge of the AUC's designation as an FTO.

110.    The Chiquita Defendants caused Chiquita to continue to pay the AUC even after its outside counsel emphatically and repeatedly advised them, beginning in late February 2003, to stop the payments. They caused Chiquita to continue to pay the AUC after DOJ officials admonished them on April 24, 2003, that the payments were illegal and could not continue. They caused Chiquita to continue to pay the AUC after the same outside counsel advised them on September 8, 2003, that the DOJ had given no assurances that the Company would not be prosecuted for making the payments. They caused Chiquita to continue to pay the AUC even after one of its directors acknowledged in an internal email, on December 22, 2003, that "***we appear [to] be committing a felony***."

111.    Outside counsel's advice to the Chiquita Defendants was memorialized in a series of contemporaneous memoranda and notes. Among other things, outside counsel advised the Chiquita Defendants:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: 'CANNOT MAKE THE PAYMENT'"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

112.    In April 2003, according to outside counsel's contemporaneous notes concerning a conversation about Chiquita's payments to the AUC, a senior officer of Chiquita said as to the DOJ: "*His and [a director's] opinion is just let them sue us, come after us. This is also [a senior officer's] opinion*." Four days later, senior officers of Chiquita instructed their subordinates to "*continue making payments*" to the AUC.

113.    In April 2003, the DOJ learned of the payments to the AUC. The DOJ officials told the Chiquita Defendants that Chiquita's payments to the AUC were illegal and could not continue. The DOJ also cautioned them, as Chiquita's outside counsel had warned them earlier, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." The DOJ *never* authorized the Chiquita Defendants to continue under any circumstances the Company's payments to the AUC. Chiquita's outside counsel later stated in writing that the DOJ never gave Chiquita any assurance that the Company would not be prosecuted for making the payments.

114.    In May 2003, an employee of Chiquita was instructed to "continue making payments" to the AUC. Chiquita thereafter continued its regular payments to the AUC. In a

memorandum dated September 8, 2003, outside counsel noted that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

115.    Senior officers and directors of Chiquita were well aware that the Company was continuing to pay a designated FTO and that the Company was subject to criminal prosecution for its continuing conduct. On December 22, 2003, a director of Chiquita sent an email to other directors regarding the Company's ongoing payments to the AUC, in which he said, among other things, "***we appear to [be] committing a felony***." A week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that "***Chiquita is knowingly violating the law***."

116.    When the DOJ learned of the continuing payments, it threatened the Chiquita Defendants and Chiquita with criminal prosecution. To protect themselves from possible criminal prosecution, on March 19, 2007, the Chiquita Defendants caused Chiquita to sign a written plea agreement with the United States in which Chiquita was required to admit its guilt. The plea agreement provides for an agreed-upon sentence of a criminal fine of $25 million ***and*** corporate probation of five years. The plea agreement provided that Chiquita must pay the criminal fine in five annual installments. Chiquita was required to post the first payment of $5 million upon entry of judgment. Chiquita is required to pay an additional $5 million, plus post-judgment interest, each year for the subsequent four years. The DOJ stated: "Defendant Chiquita has pled guilty to a very serious charge. In support of its guilty plea, the Company has admitted the truth of the facts sets [sic] forth in the Factual Proffer." It also emphasized that "Chiquita . . . admitted as part of its guilty plea ***that it continued to engage in the same criminal conduct after its voluntary disclosure***." The government's Sentencing Memorandum also clearly states: "It was particularly

important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager."

117.    When the DOJ threatened the Chiquita Defendants and Chiquita with criminal prosecution, the Chiquita Defendants abused their continuing control of Chiquita by causing it to plead guilty and pay a huge fine in return for a promise from the government not to prosecute the Chiquita executives involved in the illegal conduct, thus damaging the Company to protect themselves and their allies and friends. In order to assure that the DOJ did not prosecute any of the Chiquita directors criminally, the directors have continued to employ key wrongdoers in important corporate positions, have paid off other employees with generous severance packages and "confidentiality" agreements and promises not to pursue them civilly for their involvement in the activities which resulted in the criminal plea of Chiquita.

118.    The plea agreement provided for a five-year term of corporate probation. In addition to the general conditions of probation, the plea agreement provides for the following specific additional conditions of probation: (1) Chiquita must pay the sums set forth in the agreement; (2) Chiquita "shall implement and maintain an effective compliance and ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States Sentencing Guidelines, including, but not limited to, (a) maintaining a permanent compliance and ethics office and a permanent educational and training program relating to federal laws governing payments to, transactions involving, and other dealings with individuals, entities, or countries designated by the United States as Foreign Terrorist Organizations, Specially-Designated Global Terrorists, Specially-Designated Narcotics Traffickers, and/or Countries Supporting International Terrorism, and/or any other such federally-designated individuals, entities, or countries, (b) ensuring that a specific individual remains assigned with overall responsibility for the compliance and ethics program, and (c) ensuring that that specific individual reports directly to the Chief Executive Officer and to the

Board of Directors of Chiquita . . . , no less frequently than on an annual basis on the effectiveness of the compliance and ethics program; and (3) pursuant to 18 U.S.C. § 3563(a)(l), [Chiquita] shall not commit any federal, state or local crimes during the term of probation."

119.    On March 19, 2007, the DOJ issued a release entitled "Chiquita Brands International Pleads Guilty to Making Payments to a Designated Terrorist Organization, Agrees to Pay $25 Million Fine," which stated:

> Under the terms of the plea agreement, Chiquita's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation. . . .
>
> The plea agreement arises from payments that Chiquita had made for years to the violent, right-wing terrorist organization United Self-Defense Forces of Colombia [AUC] . . . .

<p style="text-align:center">*        *        *</p>

> **"Funding a terrorist organization can never be treated as a cost of doing business,"** stated U.S. Attorney Taylor.  **"American businesses must take note that payments to terrorists are of a whole different category.  They are crimes**."

<p style="text-align:center">*        *        *</p>

### CHIQUITA'S PAYMENTS TO THE AUC

> . . . [T]he investigation leading to this prosecution developed evidence that for over six years – from sometime in 1997 through Feb. 4, 2004 – Chiquita paid money to the AUC in two regions of the Republic of Colombia . . . .  In total, Chiquita made over 100 payments to the AUC amounting to over $1.7 million.
>
> . . . **Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees**.
>
> For several years Chiquita paid the AUC by check through various intermediaries.  **Chiquita recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."  Chiquita never received any actual security services in exchange for the payments**.
>
> Beginning in June 2002, Chiquita began paying the AUC in Santa Marta directly and in cash according to new procedures established by senior executives of Chiquita.  **The newly-implemented procedures concealed the fact that Chiquita was making direct cash payments to the AUC.  A senior Chiquita officer had described these new procedures to Chiquita's Audit Committee on April 23, 2002**.

\*       \*       \*

Beginning on Feb. 21, 2003, outside counsel emphatically advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly.  Outside counsel advised Chiquita:

"Must stop payments."

"Bottom Line: CANNOT MAKE THE PAYMENT"

"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"

"General Rule: Cannot do indirectly what you cannot do directly"

Concluded with: "CANNOT MAKE THE PAYMENT"

"You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  Chiquita should leave Colombia."

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

"[T]he company should not make the payment."

\*       \*       \*

Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004.  From April 24, 2003 (the date of Chiquita's initial disclosure to the Justice Department) through February 4, 2004, Chiquita made 20 payments to the AUC totaling over $300,000.

120.    Mario Iguarán, Colombia's Attorney General, has said he will seek the extradition of eight Chiquita officials connected to the case.  His office is also seeking information about charges that in 2001 a ship unloaded some 3,400 AK-47 rifles and 4 million rounds of ammunition in a Banadex-controlled dock in Colombia destined for the AUC.  These charges were first detailed in a 2003 report from the Organization of the American States.  "***This was a criminal relationship," said Iguarán in a recent report published in the Washington Post.  "Money and arms and, in exchange, the bloody pacification of Urabá***."

121.    On March 17, 2007, *CNN.com* reported:

Colombian President Alvaro Uribe said Saturday he favored the extradition to his country of executives of U.S. banana producer Chiquita after the company's admission that it paid Colombian right-wing death squads more than $1.7 million.

"*That would be normal.  Extradition should be from here to there and from there to here*," Uribe said.

Colombia's attorney general said he would ask the U.S. Department of Justice for full disclosure about the case and would investigate possible links to another case from 2001.  In that case, weapons and ammunition were smuggled into Colombia through a port facility operated by Chiquita's Colombian subsidiary, Banadex.

122.    U.S. prosecutors were blunt.  "*I regarded this as a murder investigation*" from the start, said Roscoe Howard Jr., former U.S. Attorney for Washington D.C., who helped lead the Chiquita prosecution before he left his position in 2004.  "*Even though Chiquita didn't murder anyone, that's what the money was used for – to buy weapons*."

123.    During 2007, Chiquita has been sued in a number of class actions brought on behalf of scores of Colombians killed by the terrorists Chiquita funded – seeking tens of millions of dollars in damages.  Some of the families of individuals killed by the right-wing AUC filed a class-action lawsuit against Chiquita in this district, alleging violations of the Alien Tort Claims Act ("ATCA") and international law.  EarthRights International, a non-profit human rights group representing plaintiffs in a New Jersey action, described that suit as follows:

Today, Colombian families represented by EarthRights International (ERI), together with the Colombian Institute of International Law (CIIL), Judith Brown Chomsky, and Schonbrun DeSimone Seplow Harris & Hoffman LLP (SDSHH), filed a federal class-action lawsuit charging Chiquita Brands International, Inc., the multi-national produce company, with funding and arming known terrorist organizations in Colombia in order to maintain its profitable control of Colombia's banana growing regions starting in the mid-1990s.  *Chiquita's payments to these paramilitary groups, including the United Self-Defense Committees of Colombia (Autodefensorias Unidas de Colombia, or AUC) and its predecessors, were reviewed and approved by senior executives of the corporation, and resulted in the targeted killings of hundreds or thousands of individuals, including trade unionists, banana workers, and political organizers*.  The case is brought on behalf of relatives of the deceased . . . .

"*To promote its business operations, Chiquita funneled money and guns to a terrorist group that murdered thousands of people and shipped untold amounts*

- 58 -

*of cocaine to the United States," said Marco Simons, ERI's Legal Director. "Now, the victims are demanding some measure of accountability from Chiquita for its egregious behavior*."

124.    The complaint filed by EarthRights detailed the links between Chiquita and the AUC that defendants had long concealed:

> 33.    Chiquita paid the AUC, directly or indirectly, nearly every month during the period 1997-2004, making over one hundred payments to the AUC totaling over $1.7 million.  Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees.
>
> *        *        *
>
> 38.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.
>
> 39.    The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.
>
> 40.    Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo. The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 millions rounds of ammunition.  These arms and ammunition were then transferred to the AUC.
>
> 41.    . . . Chiquita facilitated at least four other arms shipments to the AUC. In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."
>
> 42.    . . . On information and belief, Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

**Purchase of Atlanta/Sale of Colombian Operations**

125.    In 2004, due to the problems created in its Colombia operations due to the illegal activities the Chiquita Defendants had caused Chiquita to engage in there, and hoping to avoid extradition of Chiquita insiders to Colombia for their criminal conduct, the Chiquita Defendants

caused Chiquita to sell Chiquita's Colombian banana-producing operations. Due to these circumstances, this was, in essence, a "fire sale" – even though those Colombian operations had been Chiquita's most profitable operations. Chiquita earned some $50 million in profits from its Colombian banana-producing operations from September 10, 2001 through January 2004. Worse, the forced sale of the Colombian operations deprived Chiquita of a huge source of supply of bananas necessary to conduct its business – requiring that Chiquita, while selling the Colombian banana operations also secured a supply of bananas by purchasing them from another source at premium, *i.e.*, unprofitable, prices. The sale of this valuable asset produced a $9 million loss when the long-term banana purchase contract is factored in.

126.    While Chiquita's Colombian banana operation had, at one time, been a very profitable part of Chiquita's business, the Chiquita Defendants' illegal and improper acts largely destroy the value of the asset. The Chiquita Defendants had to sell that operation at a large loss. The Company reported:

> In June 2004, the Company sold its banana-producing and port operations in Colombia . . . .
>
> In connection with the sale, Chiquita entered into eight-year agreements to purchase bananas . . . from affiliates of the buyer . . . at above-market prices. This resulted in a liability of $33 million at the sale date, which represents the estimated net present value of the above-market premium to be paid for the purchase of bananas over the term of the contract. . . .
>
> *                *                *
>
> The Company recognized a before-tax loss of $9 million and an after-tax loss of $4 million on the transaction . . . .

127.    By 2002, Chiquita's insiders knew that they would have to cause Chiquita to sell off its Colombian banana operations due to the longstanding illegal conduct they had caused or permitted there, in part to try to avoid the extradition of several Chiquita insiders to Colombia for their criminal conduct. This sale – which they knew would take place under distress circumstances – would deprive Chiquita of millions of dollars in revenues from what had been its most profitable

operations, which would reflect very badly on the Chiquita Defendants' management and stewardship of Chiquita. Thus, to try to make up for the lost revenues and profits Chiquita would soon suffer, the Chiquita Defendants in haste, and without adequate research, investigation, evaluation or due diligence, acquired a German fruit distribution business, known as Atlanta A.G., at a grossly excessive price. Because of the excessive price the Chiquita Defendants caused Chiquita to pay for Atlanta in this hastily arranged acquisition, almost $43 million dollars in goodwill went onto Chiquita's balance sheet. According to Chiquita's 2002 Annual Report:

> *By exchanging loans for Atlanta's underlying equity interests, we were able to acquire ownership in a virtually cashless transaction that closed in March 2003*. To boost Atlanta's profitability and maximize the value of our investment, *we hired as president Peter Jung, who brings extensive restructuring, food industry and consumer products expertise. We have already begun streamlining Atlanta's distribution network, selling certain assets and reducing its debt. The acquisition of Atlanta increased Chiquita's debt by approximately $65 million and will increase our consolidated revenues on an annualized basis by almost $1.1 billion*.

128.    According to the Chiquita Defendants, the Atlanta acquisition was a huge success.

Chiquita's 2003 Annual Report stated:

> The improvement in 2003 operating income was due to Chiquita's success in cost-cutting, the benefit of a stronger euro, asset sales, increased banana and other fresh fruit sales, and *improvements at Atlanta*.

> The progress on our commitments was significant. . . . *We acquired Atlanta, exited its underperforming businesses and cut its costs. In fact, we're ahead of schedule on improving Atlanta's profitability*.

129.    According to the Chiquita Defendants, the success of Atlanta continued in 2004.

According to Chiquita's 2004 Annual Report:

> Financial highlights for 2004 include the following

> •    Net sales for 2004 were $3.1 billion compared to $2.6 billion for 2003. *Approximately 60% of the increase was due to the acquisition of Atlanta AG ("Atlanta"), a German distributor of fresh fruits and vegetables, which was completed in March 2003*.

130.    According to Chiquita's 2003 Annual Report:

Critical Accounting Policies and Estimates

- 61 -

The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements.  The additional discussion below addresses major judgments used in

- ***reviewing the carrying values of intangibles***

\*       \*       \*

Review of Carrying Values of Intangibles

\*       \*       \*

Goodwill – Substantially all of the Company's  $43 million of goodwill relates to its acquisition of Atlanta during 2003. . . .  [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

131.     According to Chiquita's 2004 Annual Report:

Critical Accounting Policies and Estimates

The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements.  The additional discussion below addresses major judgments used in

- ***reviewing the carrying values of intangibles***.

\*       \*       \*

Goodwill

Substantially all of the Company's  $46 million of goodwill relates to its acquisition of Atlanta during 2003. . . .  [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

132.     However, in truth, the hastily reckless Atlanta acquisition was a complete disaster, and one that has badly damaged the Company.  Almost immediately upon the acquisition of Atlanta, because of problems in its business, Chiquita began to write off the value (goodwill) of Atlanta, and by 2006, those charge-offs and write-downs wiped out all – 100% – of the goodwill recorded in connection with the Atlanta acquisition in less than three years.

### FUTILITY OF DEMAND ALLEGATIONS

133.     Plaintiff brings this action derivatively in the right and for the benefit of Chiquita to redress injuries suffered and to be suffered by Chiquita as a direct result of the breaches of fiduciary

duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by the Chiquita Defendants. Chiquita is named as a nominal party solely in a derivative capacity.

134.    In bringing this action, plaintiff has satisfied all statutory procedural requirements of applicable law. First, plaintiff has standing to bring this action as it is a shareholder and/or beneficial owner of Chiquita and was a shareholder and/or beneficial owner of Chiquita at relevant times. Second, plaintiff will fairly and adequately represent the interests of Chiquita in enforcing its rights, as detailed herein. Third, this action is not being used by plaintiff to gain any personal advantage, nor does plaintiff maintain any personal agenda other than to correct the wrong that has been done to the Company. To this end, plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions. To the extent court permission is required to continue this action, such permission is hereby sought.

135.    As of the filing of this Complaint, the Chiquita Board consists of defendants Aguirre, Arntzen, Fisher, Jager, Stanbrook, Serra, Barker and Hasler. These defendants are referred to as the "Director Defendants."

136.    The defendants described herein at ¶¶27-52 (except Barker) were all directors and/or senior ranking officers at Chiquita, acquiesced in and/or were complicit in making the protection payments to the AUC between 1998 and 2004 and, as demonstrated below, each of the Director Defendants (including Barker) cannot and would not conduct a meaningful investigation and/or prosecution of those parties for that misconduct, as to do so would undermine their own credibility, require them to take inconsistent positions with those they have taken in the past, and/or to expose

themselves and their comrades to a substantial likelihood of criminal and/or civil liability, both here and in Colombia, because of their egregious misconduct:[5]

        (a)    ***Aguirre.***  In a written statement issued in March 2007, immediately following Chiquita's entry into the plea agreement, Aguirre stated publicly that the Company viewed the plea agreement "as a reasoned solution to the dilemma the company faced several years ago." The Company "voluntarily disclosed the payments to the Justice Department in 2003," he stated, adding the payments were made "to protect the lives of its employees." "The payments made by the company were always motivated by our good faith concern for the safety of our employees," Aguirre said in a statement published March 22, 2007, in the *Chicago Tribune*. Aguirre made these statements knowing that the so-called "good faith" payments had continued for more than a year after the Company secretly "disclosed" the relationship to the Justice Department in 2003, at a time that Chiquita's outside lawyers were insisting that the Company terminate the arrangement. Astoundingly, Chiquita made at least nineteen more payments after the Justice Department told the Company that "payments to the AUC were illegal and could not continue." Any reconsideration of his position by Aguirre ***now*** could not be occasioned by anything he did not know ***then*** and a decision to prosecute those responsible at the Company would be wholly inconsistent with and contradictory to Aguirre's actions and statements during his entire tenure as President, CEO and

___

[5]     In March 2007, upon disclosure of the terms of Chiquita's plea agreement, and admissions by Chiquita that it paid Colombian right-wing death squads more than $1.7 million, Colombian President Alvaro Uribe stated he wanted the responsible Chiquita executives extradited to his country to face charges: "That would be normal. Extradition should be from here to there and from there to here," Uribe said. Colombian Attorney General Mario Iguarán said he would ask the U.S. DOJ for full disclosure about the case and would investigate possible links to ***another case from 2001***. In that case, weapons and ammunition were smuggled into Colombia through a port facility operated by Chiquita's Colombian subsidiary, Banadex. Colombian authorities outlawed right-wing paramilitary forces in 1989. The U.S. State Department added the AUC to its list of foreign terrorist groups in September 2001. In November 2001, Israeli arms dealers illegally shipped 3,400 AK-47 assault rifles and 4 million rounds of ammunition into Colombia for the AUC ***through a port facility operated by Chiquita subsidiary Banadex***.

Chairman of Chiquita since 2004, where he has adamantly and continually maintained the payments were proper and has taken no action to remove the executives and/or directors who oversaw and acquiesced in their payment. Aguirre, despite having lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, failing to fire or discipline the Chiquita officers responsible for the bribery payments, and permitting and participating in causing Chiquita to plead guilty to protect the other Chiquita Defendants and in causing the fire sale of the Colombian operations, remains in his dominant and controlling position.

(b) *Arntzen and Stanbrook.* Arntzen served with Hills on Chiquita's Audit Committee between 2002 and 2007 and Stanbrook served with Hills on the Audit Committee between 2003 and 2005. The Audit Committee was aware of the nature of the protection payments throughout this period. Members of the Audit Committee also knew that Chiquita's outside lawyers deemed the payments illegal and wanted them stopped. Members of the Audit Committee acquiesced in the payments to terrorists, the false accounting for the payments and the decision not to properly report the payments to the SEC between 2002 and 2004. Arntzen has publicly stated the AUC payments were not secretive, but instead were disclosed to E&Y and to Company directors on the Audit Committee. "'When I joined the board, I knew the company was making payments to paramilitary groups in Colombia,'" Arntzen told *The Wall Street Journal* in August 2007, five months *after* Chiquita's plea agreement was entered and less than one month before the DOJ would announce it had decided not to prosecute individual Chiquita executives: "'If you didn't do it, your people were going to get killed.'" In an interview with *TradeWinds* in March 2007, Arntzen stated: (i) the Chiquita Board and management "handled the Colombian disclosures properly," (ii) that he and fellow Board members had "'turned ourselves in to the Justice Department'" and "'gave them all the evidence they needed to convict us,'" (iii) that the "'*directors did what we were supposed to do,'*" and (iv) that "'You don't always know who you're paying or which side they're on. All you

know is that the people are scary and they're armed to the teeth and that if you don't pay them, your people are going to die.'" Any reconsideration of their positions by Arntzen or Stanbrook *now* could not be occasioned by anything they did not know *then* and a decision to prosecute those responsible at the Company would be wholly inconsistent with and contradictory to Arntzen's and Stanbrooks' actions and statements throughout this ordeal, where they have ardently maintained the payments were proper and have taken no action to remove the executives and/or directors who oversaw and acquiesced in them.

(c)     ***Fischer, Jager, and Serra***. On April 3, 2003, Hills and Olson reported the history of the AUC payments to the full Chiquita Board, of which current Chiquita directors Fisher, Jager and Serra were then members. Thereafter, Chiquita continued making payments to the AUC, including ten additional payments that were made between May and September totaling about $134,000, ***after the DOJ told Hills and Olson the payments were illegal on August 23, 2003***. On December 22, 2003, Hills emailed fellow directors concerning the DOJ's concerns that the Company was not being as cooperative as he felt it should be, telling them: "We cannot delegate this issue to management . . . . We appear to [be] committing a felony." Nonetheless, the payments continued – with the Board's knowledge – through February 2004. Even as Chiquita began turning over documents relating to the payments to the Justice Department, it kept making payments. Shortly after 8 a.m. on March 24, 2004, agents of the Federal Bureau of Investigation armed with subpoenas paid a surprise visit to Chiquita's Cincinnati headquarters. Later that day, FBI agents in Fort Lauderdale, Florida, descended on a Company Board meeting and delivered subpoenas. Despite the fact that the Company was forced to pay a $25 million fine, is a felon, is serving five years probation and is exposed to hundreds of millions of dollars in potential liability in the civil suits Chiquita has been named as a defendant in, none of the implicated executives have been discharged and no recovery has been sought from any of the implicated Chiquita executives or directors.

(d)  **Stanbrook, Fisher, Hasler, Serra**.    As members of the Chiquita

Compensation Committee, defendants Stanbrook, Fisher, Hasler and Serra are charged with: (i)

evaluating the performance, and reviewing and approving all compensation, of Chiquita's executive

officers; (ii) making recommendations to the Board with respect to incentive compensation and

equity-based plans; (iii) overseeing the Company's leadership and organization development,

including succession planning; and (iv) administering Chiquita's Stock and Incentive Plan.   Turning

these principles on their heads, these defendants decided to **increase** executive pay following the

Company's March 2007 plea agreement, despite Chiquita's losses and massive exposure to criminal

and civil liability.   Despite the fact that Chiquita suffered through a miserable 2006 and its stock

price dropped 25%, the Compensation Committee decided to raise Aguirre's cash salary to $900,000

a year, a 13% increase, and to grant him a new award of $1.2 million in restricted stock, an LTIP

award opportunity for the 2007-2009 performance period of $1.6 million, and an additional restricted

stock grant with a targeted value of $1.6 million.   Despite Chiquita's being run out of the banana

business due to misconduct by its executives, and Aguirre's and others' refusal to hold them

accountable, Chiquita's Compensation Committee justified this compensation increase stating

Aguirre was "helping to transform it from a seller of commodity bananas to a more diversified – and

more profitable – seller of fruit-based products."   They also almost doubled their own annual

directors' fees.   However, by this decision shareholders are being penalized twice: as the firm's

equity owners, they pay the ultimate price for the misconduct, and then they must pay bonuses on

top of handsome salaries for the cleanup efforts.   Additionally, on August 3, 2006, the Compensation

Committee accepted Olson's resignation and entered into an agreement with him providing for one

year's annual base salary and target bonus, aggregating $622,500, paid between March 1, 2007 and

August 24, 2007; $138,333 representing the pro rata portion of his 2006 target bonus; $7,434 in

company-paid COBRA health insurance premiums through August 2007; $10,000 in reimbursement

of legal fees related to the agreement; the acceleration of the vesting of 59,639 shares of restricted stock previously issued to him; and payment of up to 12 months of office space and services for Olson and maintenance of existing director and officer liability insurance covering him. In exchange, Olson entered into a "retirement" agreement containing a confidentiality agreement of unlimited duration, among other provisions.

(e)     ***Arntzen and Stanbrook.***  As members of the Chiquita Audit Committee between 2002 and 2004, Arntzen and Stanbrook were charged with selecting and assessing the performance of  Chiquita's outside auditors and approving their fees and independence; assessing and approving the annual audit results of the Company;  establishing and enforcing Chiquita's financial and accounting policies and its annual and quarterly financial statements; reviewing the adequacy and effectiveness of Chiquita's internal accounting controls and the internal audit function; overseeing the Company's programs for compliance with laws, regulations and Company policies; considering any requests for waivers from the Code of Conduct for executive officers and directors (any such waivers being subject to Board approval); and, in connection with all of the foregoing, meeting with the independent auditors, internal auditors and Chiquita's financial management.  As such, these Audit Committee defendants had direct oversight and participation in the decision to falsely account for the terrorist payments and to misreport them to the SEC.  These Audit Committee defendants also repeatedly facilitated the Company's non-compliance with laws, regulations and Company policies by refusing to exercise their authority under the Audit Committee charter to remove the offending officers and directors from their posts.

(f)     ***Serra*** could not independently and disinterestly consider a presuit demand to bring the claims alleged herein as Serra's livelihood and career prospects would be compromised if he actively investigated or made the decision to prosecute these claims.  Serra is a Mexican economist and a foreign trade specialist with vast ties to the Latin America fruit and vegetable trade

import/export business. Serra is Chairman of SAI Consulting and Principal of NAFTA Fund. His professional practice includes the design of investment strategies in Mexico for foreign companies and advice to Mexican companies interested in becoming regional players in North America.

(g)    ***Barker*** could not independently and disinterestedly consider a presuit demand to bring the claims alleged herein, as Barker is beholden to the other Board members who appointed him. Moreover, Barker has attempted to market himself as a consultant and expert based on his former status as a major partner at KPMG, and diligently investigating and prosecuting the claims alleged herein would threaten those interests – something Barker will not do. Barker has never been elected by the Chiquita shareholders. He was hand-picked by Aguirre and the other Board members – all defendants herein – only after they were comfortable that he would not take any action adverse to them. Because they hand-picked him and because Barker spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits and sympathy toward firms like E&Y (still a defendant in the State law action) – he will never sue them, and could not, in any event, since he is only one Board member and is controlled and dominated by the other Board members, defendants herein.

137.    The Chiquita Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, as detailed herein, and thus, plaintiff's demand upon the Company to take the action requested herein is excused. For the following reasons and those detailed elsewhere in this Complaint, Chiquita's Board and its management are also antagonistic to this lawsuit and thus, plaintiff has not made a pre-filing demand on the Chiquita Board to initiate this action:

(a)    The factual allegations contained herein detail a widespread, continuous, global pattern and practice of misconduct that spans more than six years. Each of the Chiquita

Defendants had the ability to cause Chiquita to disclose the existence of the illegal protection payment scheme during that six-year period and failed to do so.

(b)        The misconduct alleged herein is so egregious that it created a substantial fear of personal criminal or civil liability on the part of several current members of the Chiquita Board in light of the successful DOJ prosecution resulting in a $25 million fine and the pending civil suits. As a result, the Chiquita Board is incapable of exercising valid business judgment as of the filing of this suit, as to investigate and/or prosecute these claims would expose, or increase the exposure of, each Board member to criminal and/or civil liability for the misconduct alleged herein.

(c)        In addition, the misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure – it had to be the result of a deliberate policy of the Board or willful or reckless disregard for what has been going on with said illegal or improper payments.  According to the government's Sentencing Memorandum, Chiquita's top officers and directors knew that for over six years – from sometime in 1997 through February 4, 2004 – Chiquita, through its wholly-owned Colombian subsidiary, Banadex, paid money to the AUC, a violent, right-wing terrorist organization in the Republic of Colombia.  According to the government's Sentencing Memorandum:

A.        **The Gravity of the Core Conduct**

This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years – from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.

Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquita's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.

The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money

helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.

B.    **Defendant Chiquita's Motivations**

Defendant Chiquita's motivations for paying the AUC are irrelevant to the illegality of its conduct or to the harm that the Company's conduct has caused to victims of AUC violence.  As one federal appeals court has noted, "Terrorist organizations use funds for illegal activities regardless of the intent of the donor[.]" *Boim v. Quranic Literacy Inst. & Holy Land Found, for Relief and Dev.*, 291 F.3d 1000, 1027 (7lh Cir. 2002) (discussing breadth of criminal liability under the material support statute, 18 U.S.C. § 2339B). Nevertheless, defendant Chiquita's motivations for paying the AUC are relevant to an understanding of the felony charge against the Company.

Preliminarily, it is important to note what defendant Chiquita is not accused of.  Defendant Chiquita is not accused of supporting the goals or ideologies of the terrorist organizations that the Company funded.  The record reflects that defendant Chiquita did not seek out the AUC to start making these payments. Rather, the AUC, through its leader Carlos Castaño, instructed that defendant Chiquita's subsidiary would have to start making the payments once the AUC moved into the Company's banana-producing region.

Defendant Chiquita, however, did not make one or two payments while deciding on a course of action to take in the face of the AUC's demand (and implied threat) in 1997.  Defendant Chiquita decided to accede to the AUC's demand and make routine payments for fully six years. Although defendant Chiquita would later claim that it was the victim of AUC extortion, the Company did not report the "extortion" to any United States or Colombian authorities for several years.

Defendant Chiquita, as a large multinational corporation, had choices to make about where in the world to operate and under what conditions.  The Company chose to enter and exit markets and to buy and sell farms based on its business judgment. Defendant Chiquita chose to remain in Colombia and make payments to the AUC that it deemed necessary to operate in the Urabá and Santa Marta regions of Colombia.

Defendant Chiquita's reason for being in Colombia was, of course, to produce bananas profitably. And there is no question that defendant Chiquita profited from its Colombian operations during the period that the Company paid the AUC. According to defendant Chiquita's records, from September 10, 2001 (the date of the AUC's designation as a Foreign Terrorist Organization), through January 2004, the Company earned approximately $49.4 million in profits from its Colombian banana-producing operations.  Indeed, by 2003 the Company's Colombian operations were its most profitable.

Whatever motivated defendant Chiquita at the start, the Company made a business decision to remain in Colombia and pay the AUC for over six years. Officers of defendant Chiquita and Banadex referred to the payments as an unsavory

- 71 -

"cost of doing business" at their inception in 1997. When the internal investigation into the payments was presented to the Board in September 2000, the Board treated them as a routine business matter – a tolerable expense to be kept low. When the AUC in Santa Marta demanded direct, cash payments in 2002, senior officers of defendant Chiquita obliged. These senior executives also came up with a procedure to record these monthly payments in the Company's books and records that failed to reflect the ultimate and intended recipient of the payments.

By late February 2003, when defendant Chiquita's outside counsel advised the Company to stop the payments immediately in light of the AUC's designation as an FTO and the attendant risk of criminal liability, the payments had already been reviewed and approved at the highest levels of the Company for years. The fact of the AUC demand in 1997 and any perceived risk to the Company's employees from doing business in Colombia were not new topics. The payments had been discussed repeatedly in defendant Chiquita's Cincinnati headquarters. The Company had long since made the business judgment to remain in Colombia, to keep paying the AUC, to record the payments in the Company's books and records without identifying the AUC, and not to report the payments to the pertinent United States and Colombian authorities.

The new information in late February 2003 was not the claimed extortion, but rather outside counsel's advice about the risk of criminal liability to the Company for making the payments. Defendant Chiquita chose to reject that advice and to continue to pay the AUC. The Company chose to continue the payments even after being advised by the Department of Justice that the payments were illegal and could not continue.

Defendant Chiquita has claimed that it made the payments to protect its employees. Undoubtedly some officers, directors, and employees of defendant Chiquita with knowledge of the payments firmly believed (and still believe) that the Company's sole motivation for making the payments was to protect its Colombian employees. As mentioned, the Company's motivation is legally irrelevant and of no comfort to the victims of the AUC's violence. But even this purported rationale for the payments begs serious questions. If defendant Chiquita was solely motivated to protect its Colombian employees from the AUC,

•       How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

•       How did the payments protect the communities in which those employees lived?

•       How did the payments protect the families, friends, and associates of the Company's employees?

•       What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

- Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

- Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

- Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?

C.     **Defendant Chiquita's Alternatives**

The Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law.  Defendant Chiquita is a sophisticated multinational corporation with access to the highest quality business and legal advice.  There were a number of points at which the Company could have conformed its conduct to the requirements of the law.  US failure to do so until late in the evolution of this matter is one of the reasons that the Company appears before the Court having pled guilty to a very serious criminal charge.

Defendant Chiquita was not without any alternative to paying the AUC. While there may have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option that the Company could have considered when faced with the AUC's demand in 1997.  As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments.  The officer stated, "[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia." In late February and March 2003, defendant Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia.  When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia. Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia."  Indeed, within one month of joining defendant Chiquita as its new CEO, Fernando Aguirre told senior officers that "if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

Defendant Chiquita may well have had other alternatives – other than the course that it pursued.  In the end, the issue is not what defendant Chiquita could have done, but rather what it chose to do– and that was to continue paying terrorists for over six years.

138.    The Chiquita Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the government should not have prosecuted Chiquita.  According to Chiquita's response to the government's Sentencing Memorandum:

When Chiquita learned in 2003 (and not earlier as the government implies) that the U.S. government had designated the AUC as a foreign terrorist organization, thereby making the payments illegal under U.S. law, Chiquita voluntarily disclosed its intolerable dilemma to the Department of Justice and sought its guidance – guidance that, despite the government's acknowledgement of the "complicated" nature of the life-and-death situation facing Chiquita, was never provided. *For the government now to attempt to hide behind the simplistic position that "[t]he Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law"* (Sentencing Mem. at 16) *is a hollow, post hoc rationalization that ignores reality. That is especially true in an area that the government has itself indicated is vital to the country's interest – national security. The government's position that companies like Chiquita should comply with the law without the government's input or help does much to undermine the government's goal of encouraging self-reporting and full cooperation*.

. . . Chiquita agrees that the government faced a very substantial risk of losing this case if it had proceeded to trial. Indeed, it is Chiquita's position that, in light of the Company's voluntary disclosure of the payments and its complete cooperation with the government's subsequent investigation, *the government should have foregone prosecution in this matter altogether*.

139.    As detailed elsewhere herein, an overwhelming majority of the current members of the Chiquita Board are hopelessly conflicted as well as potentially personally liable and as such have not and cannot comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Chiquita, as this would require them to sue themselves, several of Chiquita's current executives and several former Board members and executives (who they have improperly caused Chiquita to release or agree to indemnify) who would provide damning inculpatory testimony as to the current Board's involvement, knowledge and malfeasance if they were sued. In fact, so as to protect themselves, the directors not only engineered a plea deal costing the Company millions while letting the responsible executives off the hook, but have allowed several executives to stay in their lucrative positions of corporate trust, even though they unquestionably engaged in criminal conduct that damaged the Company! For example:

(a)    Aguirre, the Chairman and CEO, who lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, has failed to fire or discipline the Chiquita officers responsible for the bribery payments, and permitted and participated in causing Chiquita to

plead guilty to protect the other Chiquita Defendants and causing the fire sale of the Colombian operations, remains in his dominant and controlling position.

(b)    The current directors will not pursue legal action against the officers and directors involved in the wrongdoing as this will create further evidence of those officers' and directors' active illegal conduct in violation of Colombian law, increasing the likelihood of their extradition to Colombia.  Extradition would put tremendous pressure on the Chiquita officers and directors to implicate the current directors, and further expose and detail their complicity in the criminal conduct.

(c)    The current directors will not objectively consider – let alone bring or vigorously prosecute – claims against the directors and officers of Chiquita who were actively involved in the criminal misconduct, because they have continued to permit the employment of several of these individuals, such as defendants Zalla and Kistinger, in fiduciary positions of trust and confidence at the Company, and chose to send others like Olson off with a king's ransom rather than demanding contribution from them for their transgressions against Chiquita.  Each of these decisions would be called into question, and evidence of their conduct revealed, if the current directors investigated the allegations herein.

140.    A majority of the current Board approved the Atlanta acquisition and the Colombia disposition which damaged the Company.  A majority of the current Board increased their own compensation and that of the officers still at the Company involved in the wrongdoing, notwithstanding their responsibility for this scandal.

141.    Vigorously investigating the wrongdoing alleged herein or suing to remedy it would require the Chiquita Board to denounce entrenched positions.  Defendants could also have to reveal evidence of their culpability and criminality.  Prosecution of the allegations contained herein in light

of the Chiquita Board's prior claims of "innocence" would undermine each Board member's defense and exponentially increase each Board member's exposure to potential civil and/or criminal liability.

142.    The members of Chiquita's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

143.    The members of Chiquita's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

144.    The members of Chiquita's Audit Committee during the relevant period were defendants Verity, Waddell, Hills (Chair), Arntzen, Benjamin, Stanbrook, Fisher and Jager, who were charged with (i) reviewing the effectiveness of the Company's financial reporting and internal control policies and procedures for the identification, assessment and reporting of risk; (ii) monitoring the role and effectiveness of the internal audit function; (iii) considering and approving recommendations to the Board on the appointment of the outside auditors; (iv) keeping the relationship with the outside auditors under review, including the terms of their engagement and fees, their independence and their expertise, resources and qualifications; (v) monitoring the integrity of the Company's financial statements; and (vi) reviewing significant financial reporting issues and judgments. The Audit Committee specifically received presentations during the relevant period addressing the Company's purported "compliance processes." By virtue of the fact that each member of the Audit Committee was charged with ensuring that Chiquita complied with its anti-

bribery compliance processes and applicable law and with ensuring that Chiquita's accounting and reporting practices reflected all potential liability, defendants Arntzen, Stanbrook, Fisher and Jager are personally implicated by the allegations contained herein.

145.    Defendants Aguirre and Fisher are so-called "inside directors" as they are (or were during the relevant period) executives of Chiquita.  These defendants are dependent upon the other defendants for continuation of their livelihood.  These inside directors were well compensated for their services during the relevant period.

146.    The Chiquita Board delegated to the Compensation Committee, consisting of defendants Verity, Waddell, Benjamin (Chair), Arntzen, Jager, Stanbrook, Fisher, Hasler and Serra during the relevant period, its authority to set executive pay for the Chairman and executive directors.  By virtue of the fact that each member of the Compensation Committee was charged with ensuring that Chiquita's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, defendants Arntzen, Jager, Stanbrook, Fisher, Hasler and Serra are personally implicated by the allegations contained herein.

147.    The Chiquita Board's non-executive directors are also rewarded handsomely.  By virtue of the fact that each member of the Non-Executive Directors' Fees Committee was charged with ensuring that Chiquita's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, these defendants are personally implicated in the allegations contained herein.

148.    Members of the Chiquita Board as a whole had direct knowledge of the illegal malfeasance, had the background to understand the illegality of the conduct and had close alliances with and allegiances to the inside directors and other culpable parties who engaged in the illegal

activities complained of herein who they are dependent upon for continuation of their lucrative and prestigious positions as directors.

149.    In order to bring this action for breaching their fiduciary duties, the members of the Chiquita Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

150.    Chiquita's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Chiquita. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Chiquita against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Chiquita, there would be no directors' and officers' insurance protection and thus, this is a further reason why the directors will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

151.    For the foregoing reasons, there is a reasonable doubt that:  (i) the directors are disinterested and independent; or (ii) their conduct, which is at issue here, was otherwise the product of valid business judgment.

## COUNT I

### (Derivative Claim for Breach of Fiduciary Duties
### Against the Chiquita Defendants)

152.    Plaintiff hereby incorporates ¶¶1-150.

153.    The Chiquita Defendants are fiduciaries of Chiquita and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently.  This cause of action is asserted based upon these defendants' acts in violation of applicable law, which acts constitute a breach of fiduciary duty.

154.    The Chiquita Defendants, in their roles as executives and/or directors of the Company, made false and misleading statement in Annual Reports and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of herein.  The bribery payments were *ultra vires* and a waste of corporate assets even if they were not illegal under U.S. or other law when made.

155.    The Chiquita Defendants are responsible for the gross mismanagement of Chiquita, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:

    (a)    They caused Chiquita to engage in *ultra vires* acts and to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

    (b)    They violated their duties of compliance by causing Chiquita to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties by engaging in *ultra vires* and illegal conduct.

    (c)    They violated their duty of candor by lying to Chiquita's public shareholders.

    (d)    They violated an SEC consent decree, causing Chiquita to commit criminal acts.

- 79 -

(e)    They abused their control of Chiquita for their own personal gain, aggrandizement and protection.

(f)    They exposed the Company and its shareholders to massive fines and penalties and civil suits, expenses and liabilities.

(g)    They subjected Chiquita to adverse publicity and loss of goodwill.

156.    As a result of the Chiquita Defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, Chiquita has suffered considerable damage.

157.    All the Chiquita Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

158.    The Chiquita Defendants abused the control vested in them by virtue of their high-level positions at the Company.

159.    By reason of the foregoing, these Chiquita Defendants have breached their fiduciary obligations of care, candor, compliance and control to Chiquita and its shareholders.

160.    Chiquita and its shareholders have been injured by reason of these defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and a representative of Chiquita, seeks damages and other relief for the Company.

**COUNT II**

**(Derivative Claim for Waste of Corporate Assets
Against the Chiquita Defendants)**

161.    Plaintiff hereby incorporates ¶¶1-150.

162.    As a direct result of the wrongdoing alleged herein, the Chiquita Defendants have unreasonably and unnecessarily caused Chiquita to wrongfully expend and waste billions of dollars

of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

163.    Additionally, the Chiquita Defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

164.    As a direct and proximate result of the Chiquita Defendants' waste of corporate assets as alleged herein, Chiquita has sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon.

B.    Directing Chiquita to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Articles and take such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    an amendment to the Company's Articles limiting the number of executive directors on the Chiquita Board to one;

(ii)    a proposal to strengthen the Chiquita Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    establishing an effective anti-bribery or corruption exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

(iv)    a provision to permit the shareholders of Chiquita to nominate at least three candidates for election to the Chiquita Board;

(v)    appropriately test and then strengthen the internal audit and control functions;

(vi)    reform executive compensation;

(vii)    require full compliance with Sarbanes-Oxley; and

(viii)    permit shareholders to question all executive directors of Chiquita at the Annual Meeting of Shareholders and establish a more transparent process for receiving and evaluating shareholder proposals.

C.    Voiding all indemnity agreements with, and recapturing all severance or departure payments to, any officer or director found to have been actively involved in the wrongdoing.

D.    Terminating the employment of Zalla and Kistinger and any other current member of Chiquita's management found to have been actively involved in the wrongdoing.

E.    Recapturing all directors' fees and other compensation or reimbursement paid to any of the Chiquita directors named as defendants.

F.    Discharging E&Y as Chiquita's accountants.

G.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby.

H.    Awarding punitive damages.

I. Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

J. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury with respect to all issues so triable.

DATED: January 15, 2008

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)

Roger Adelman

ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

COUGHLIN STOIA GELLER RUDMAN
& ROBBINS LLP
ARTHUR C. LEAHY
AMBER L. ECK
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CasesSD\Chiquita Derivative\Cpt CHIQUITA Federal District of Columbia doc
¶

<u>VERIFICATION</u>

I, Mary K. Blasy, hereby declare as follows:

1.    I am an associate of the law firm of Coughlin Stoia Geller Rudman & Robbins, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.    I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 14th day of January 2008, at San Diego, California.

MARY K. BLASY

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Hawaii Annuity Trust Fund for Operating Engineers, 1001 Bishop St., 18th Fl., Honolulu, HI 96813 96850 | Roderick M. Hills, et al. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ____Honolulu____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Law Office of Roger M. Adelman
1100 Connecticut Ave. NW Ste. 730
Washington, DC 20036
202/822-0600

Case: 1:08-cv-00081
Assigned To : Friedman, Paul L.
Assign. Date : 1/15/2008
Description: Contract

*JURY ACTION*

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

26

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊙ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☒ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Shareholder derivative suit alleging breach of fiduciary duty, waste of corporate assets and conspiracy and aiding and abetting. *28 USC 1332*

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ [_____] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☒  NO ☐ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  1/15/08    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.